# United States Court of Appeals
## For the First Circuit

Nos. 11-1689, 11-1744

UNITED STATES,

Appellee,

v.

CARLOS H. RIVERA-RODRÍGUEZ

and ALBERT MERCADO-CRUZ,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Thompson, Lipez, and Kayatta,

Circuit Judges.

Michael Covington Bagge, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and Nelson Pérez-Sosa and Thomas F. Klumper, Assistant United States Attorneys, were on brief, for appellee.
Rafael F. Castro Lang for appellant Carlos H. Rivera-Rodríguez and Guillermo A. Macari-Grillo for appellant Albert Mercado-Cruz.

August 4, 2014

**LIPEZ, <u>Circuit Judge</u>.** Appellants Carlos H. Rivera-Rodríguez and Albert Mercado-Cruz appeal their convictions and sentences on drug possession and distribution charges. Rivera-Rodríguez claims that the district court's improper questioning of witnesses and its handling of a dispute during closing arguments unfairly prejudiced the jury against him. He further alleges prosecutorial misconduct. Mercado-Cruz, through counsel and by way of a pro-se brief, alleges a number of errors relating to his conviction and sentencing, including a claim that the government's criminal history information should not have triggered a mandatory life sentence because it was not timely filed. See 21 U.S.C. § 851(a).

After a close review of the record, we agree that Rivera-Rodríguez's conviction must be vacated due to the district court's improper questioning of witnesses and its intervention during closing arguments. We affirm Mercado-Cruz's conviction and sentence.

## I.

Rivera-Rodríguez and Mercado-Cruz were among sixty-four co-defendants charged with involvement in a conspiracy to distribute various types of illegal drugs and prescription medications for recreational use.[1]  They were the only two co-

---

[1] The indictment charged Rivera-Rodríguez and Mercado-Cruz with: (1) conspiring to possess with intent to distribute one kilogram or more of heroin, five kilograms or more of cocaine, fifty grams or more of cocaine base, one thousand kilograms or more of marijuana, and detectable amounts of Oxycodone (a/k/a,

-2-

defendants who elected to stand trial rather than accept plea agreements.

Up to and including the first day of trial, Mercado-Cruz's counsel, Attorney Lincoln-San-Juan, attempted to persuade his client to accept a plea bargain that would have resulted in the government recommending a sentence of between seventy-seven and ninety-six months of imprisonment. On the day trial was scheduled to begin, the government sought to introduce an information pursuant to 21 U.S.C. § 851 to establish that Mercado-Cruz had prior drug convictions and was thus subject to a mandatory life sentence if convicted on Count One.[2] Lincoln-San-Juan asked the government to delay filing that information so that he could

_____

"Percocet"), and Alprazolam (a/k/a "Xanax"), within one thousand feet of a public housing project and school, in violation of 21 U.S.C. §§ 841(a)(1), 846, and 860 (Count One); (2) aiding and abetting in the distribution of one or more kilograms of heroin within one thousand feet of a public housing project and school, in violation of 21 U.S.C. §§ 841(a)(1) and 860 and 18 U.S.C. § 2 (Count Two); (3) aiding and abetting in the distribution of fifty or more grams of cocaine base within one thousand feet of a public housing project and school, in violation of 21 U.S.C. §§ 841(a)(1) and 860 and 18 U.S.C. § 2 (Count Three); (4) aiding and abetting in the distribution of five or more kilograms of cocaine within one thousand feet of a public housing project or school, in violation of 21 U.S.C. §§ 841(a)(1) and 860 and 18 U.S.C. § 2 (Count Four); and (5) aiding and abetting in the distribution of a measurable amount of marijuana within one thousand feet of a public housing project and school, in violation of 21 U.S.C. §§ 841(a)(1) and 860 and 18 U.S.C. § 2 (Count Five).

[2] Under § 851, when the government expects to seek a sentencing enhancement based on a defendant's prior convictions, it must provide notice to the court and the defendant before trial in the form of an information listing the convictions to be relied upon. 21 U.S.C. § 851(a)(1).

implore his client one final time to take the plea deal after informing him that he could face a mandatory life sentence. Mercado-Cruz elected to stand trial.

That same day, Mercado-Cruz complained that he was brought to court for trial wearing prison clothes. The court refused to continue the trial on that basis, explaining that it was the defendant's responsibility to supply his own alternate clothes. Trial then began with jury selection. The § 851 information was filed shortly thereafter during trial.

Trial began with testimony from a number of witnesses involved with the law enforcement investigation of a "drug point" in the Praxedes Santiago Public Housing Project. These witnesses testified to background information about the scope of the alleged conspiracy to distribute drugs there, but did not, aside from a brief identification of Mercado-Cruz, provide any evidence specifically tying the defendants to the conspiracy.[3] To inculpate the defendants, particularly Rivera-Rodríguez, the government relied primarily on the testimony of two cooperating witnesses who had already pled guilty to their involvement in the drug conspiracy. During the questioning of those witnesses by the

_____

[3] Indeed, the district court expressed some frustration with the government's presentation of its case and the vast amount of background information that was not tied to the co-defendants on trial. At one point the court remarked to the Assistant United States Attorney, "I'm losing my patience. I want you to come and present evidence about this case. We have been one week here, and we haven't heard anything about this case."

government, the court interjected its own inquiries about the plea agreements that required the cooperating witnesses to testify truthfully. If they did not, as the court emphasized through its questioning, there could be consequences for the cooperating witnesses, including charges for perjury, false statements, and obstruction of justice, as well as the imposition of sentences beyond the terms of the plea agreements.[4]

Multiple witnesses[5] testified to seeing Mercado-Cruz in possession of various drugs in and around the drug point in the Praxedes Santiago Public Housing Project. Two cooperating witnesses, Pedro Rodríguez Fernández, a/k/a Cunta, and Adalberto Torres Ocasio, a/k/a Marruecos, identified him as a seller of these illegal drugs. Marruecos also testified that Mercado-Cruz carried a firearm around the drug point. The police officer who arrested Mercado-Cruz testified to finding on his person at the time of arrest prescription pills in a bottle with the label torn off. The pills and the bottle were tested and entered into evidence against Mercado-Cruz.

---

[4] Further details of the court's interactions with witnesses are examined infra.

[5] The witnesses who so testified were not only the two cooperating witnesses, but also José Montañez-Santos, a government witness who was previously an informant with the DEA, and FBI Agent Francisco Aponte. Rivera-Rodríguez's witness, Keila Flores-Ramos, also identified Mercado-Cruz as someone whom she had seen working at the drug point.

Government witness José Montañez-Santos and defense witness Keila Flores-Ramos testified that Rivera-Rodríguez was not himself a drug user, but his son was a known addict who hung around the drug point. Cunta and Marruecos, the two cooperating witnesses, testified that Rivera-Rodríguez set up a lookout scheme to protect drug dealers by providing hand-held radios (or "scanners") to paid lookouts posted at the entrance to the housing project who could then warn the sellers when the police were coming. Testifying in his own defense, Rivera-Rodríguez insisted that he interacted with drug dealers and others at the drug point only to prevent them from selling to his son. Apart from the cooperating witness testimony, the government introduced a hand-held radio into evidence that was similar, but not identical, to the ones Rivera-Rodríguez allegedly kept in his home and used to orchestrate the lookout scheme. No evidence was seized from Rivera-Rodríguez or his home.

The jury found Rivera-Rodríguez guilty on all counts and Mercado-Cruz guilty on Counts One, Three, and Four. At sentencing, the government offered to amend the § 851 information as to Mercado-Cruz in exchange for a waiver of his right to appeal, which would have had the effect of lowering the applicable mandatory minimum sentence to twenty years, rather than life. Mercado-Cruz refused the deal. The court sentenced him to the mandatory term of life imprisonment as to Count One and to two terms of 262 months' imprisonment as to Counts Three and Four, to be served

concurrently.[6]  The court sentenced Rivera-Rodríguez to a term of 120 months' imprisonment as to each count to be served concurrently with each other.  This timely appeal followed.

**II.**

**A.  Rivera-Rodríguez's Claims**

**1.  The Court's Interventions**

**a.  Legal Framework**

It is well settled that the district court is more than a "mere moderator" in a federal jury trial. Quercia v. United States, 289 U.S. 466, 469 (1933).  Among other things, the judge

> "has the prerogative, and at times the duty, of eliciting facts he deems necessary to the clear presentation of issues.  To this end he may examine witnesses who testify, so long as he preserves an attitude of impartiality and guards against giving the jury an impression that the court believes the defendant is guilty."

United States v. Paz Uribe, 891 F.2d 396, 400-401 (1st Cir. 1989) (quoting Llach v. United States, 739 F.2d 1322, 1329-30 (8th Cir. 1984)); see also Fed. R. Evid. 614(b) ("The court may examine a witness regardless of who calls the witness.").  The law affords the trial court broad discretion for judicial interrogation. See 29 Charles Alan Wright & Victor James Gold, Federal Practice & Procedure § 6235 (1997).

---

[6] The court properly grouped these sentences pursuant to U.S.S.G. § 3D1.2(d).

Nonetheless, in questioning witnesses, as in all aspects of trial administration, the court must scrupulously avoid any appearance of partiality, lest it run afoul of the maxim that "'[p]rosecution and judgment are two quite separate functions in the administration of justice; they must not merge.'" United States v. Norris, 873 F.2d 1519, 1527 (D.C. Cir. 1989) (quoting United States v. Marzano, 149 F.2d 923, 926 (2d Cir. 1945) (alteration in original)). Each judicial intervention raises the possibility that the jury will perceive the court as biased toward one party or another. See Starr v. United States, 153 U.S. 614, 626 (1894) ("It is obvious that under any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling."). To determine whether the jury would perceive bias, we often must examine each intervention in the context of the trial as a whole. See United States v. Polito, 856 F.2d 414, 418 (1st Cir. 1988).

Where, as here, a convicted defendant claims that the trial court overstepped its bounds and gave an appearance of judicial bias that requires a new trial, "'we consider whether the comments were improper and, if so, whether the complaining party can show serious prejudice.'" United States v. Ayala-Vazquez, 751 F.3d 1, 24 (1st Cir. 2014) (quoting United States v. DeCologero, 530 F.3d 36, 56 (1st Cir. 2008)); see also Logue v. Dore, 103 F.3d 1040,

-8-

1045 (1st Cir. 1997) ("An inquiry into the judge's conduct of the trial necessarily turns on the question of whether the complaining party can show serious prejudice."). This requirement that the defendant demonstrate "serious prejudice" applies even when the defendant has made contemporaneous objections to the interventions of the trial court and has persuaded the reviewing court that those interventions gave the appearance of judicial bias. The demonstration of the appearance of judicial bias is akin to a showing of trial error. Cf. United States v. Ofray-Campos, 534 F.3d 1, 33 (1st Cir. 2008).

There then remains the question of prejudice linked to the appearance of bias. Ordinarily, if there are preserved objections to trial error in a criminal case (such as errors in evidentiary rulings or jury instructions), the government has the burden of demonstrating that the errors were not prejudicial. See, e.g., United States v. Jiménez, 419 F.3d 34, 41-42 (1st Cir. 2005) (reaffirming that where "the objection is preserved, erroneous admission of improperly seized evidence at trial is reviewed for harmless error. . . . [and] the burden is on the government to show that the supposed error did not affect the outcome of trial"). But in this circumstance, when the claims of trial error involve interventions by the court that create the appearance of bias, the defendant retains the burden of demonstrating serious prejudice. Ofray-Campos, 534 F.3d at 33.

Arguing, with virtually no reference to the record, that Rivera-Rodríguez failed to preserve his objections to the court's interventions, the government contends that the plain error standard of review applies to Rivera-Rodríguez's claims that the court's interventions made his trial fundamentally unfair. The government may be correct that two of the four interventions discussed below were not subject to contemporaneous objections by Rivera-Rodríguez. The absence of contemporaneous objections, however, does not justify the application of a different prejudice analysis, based on the third prong of the plain error standard, to those portions of Rivera-Rodríguez's claim of fundamental unfairness involving the interventions not subject to contemporaneous objections. Given the burden on the defendant to demonstrate serious prejudice in a case such as this even for preserved objections, and the substance of the serious prejudice test, the showing required of the defendant is already comparable to the burden on the issue of prejudice when his claim is subject to the plain error standard.[7]

_____

[7] We acknowledge that the "serious prejudice" inquiry does not formally incorporate the entirety of plain error review. The plain error standard has a fourth element —- that "the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" United States v. Olano, 507 U.S. 725, 736 (1993) (alteration in original) (quoting United States v. Atkinson, 297 U.S. 157, 160 (1936)). However, in a case such as this, where a serious prejudice finding means that the judge's own conduct compromised the fundamental fairness of the trial, the improper conduct necessarily affects the fairness, integrity, or public reputation of judicial proceedings.

We have not previously had occasion to explicitly define the contours of "serious prejudice" resulting from improper judicial intervention. In Ayala-Vazquez, 751 F.3d at 26, we looked to our analysis of claims of prosecutorial misconduct in United States v. Gentles, 619 F.3d 75 (1st Cir. 2010). There, we held that "the test [for the requisite prejudice] is whether the [] misconduct so poisoned the well that the trial's outcome was likely affected, thus warranting a new trial." Gentles, 619 F.3d at 81 (internal quotation marks omitted). Plain error review also requires us to determine when an error "likely 'affected the outcome of the district court proceedings.'" United States v. Hebshie, 549 F.3d 30, 44 (1st Cir. 2008) (quoting United States v. Olano, 507 U.S. 725, 733 (1993)). Interpreting that language, we have explained that a trial's outcome was likely affected when there is "'a reasonable probability that, but for [the error claimed], the result of the proceeding would have been different.'" Hebshie, 549 F.3d at 44 (alteration in original)(quoting United States v. Padilla, 415 F.3d 211, 221 (1st Cir. 2005)(en banc)). Accordingly, improper judicial intervention "seriously prejudiced" a defendant's case when we find that there is a reasonable probability that, but for the error, the verdict would have been different. Moreover, in cases with multiple judicial interventions, determining the appearance of bias and the prejudicial effect of that bias

-11-

generally involves a cumulative effect inquiry.[8]  See Polito, 856
F.2d at 418.

In conducting that inquiry, we "consider[] 'isolated
incidents in light of the entire transcript so as to guard against
magnification on appeal of instances which were of little
importance in their setting.'" United States v. Candelaria-Silva,
166 F.3d 19, 35 (1st Cir. 1999) (quoting United States v. Montas,
41 F.3d 775, 779 (1st Cir. 1994)).  In this context, the Supreme
Court has held that "expressions of impatience, dissatisfaction,
annoyance, and even anger . . . are within the bounds of what
imperfect men and women . . . sometimes display.  A judge's
ordinary efforts at courtroom administration -- even a stern and
short-tempered judge's ordinary efforts at courtroom administration
-- remain immune" to claims of judicial bias.  Liteky v. United
States, 510 U.S. 540, 555-56 (1994).

---

[8] There is a practical reason to examine the cumulative effect
of multiple interventions in a case involving a demand for a new
trial on the basis of the appearance of judicial bias.  An initial
intervention by the judge that makes defense counsel uneasy may not
justify an objection from counsel, who is sensibly reluctant to
challenge the judge prematurely.  Over the course of the trial,
however, if those one-sided judicial interventions multiply,
defense counsel may then realize that he or she must object on the
basis of the appearance of judicial bias, citing the cumulative
effect of the judge's one-sided interventions.  Cf. United States
v. Tilghman, 134 F.3d 414, 417 (D.C. Cir. 1998) (stating that "when
reviewing [immediately objected-to] questions [of the judge] we
must review the record as a whole, including [previously
unobjected-to] questions [from a prior day of trial]").

In focusing on the appearance of bias, courts have noted that the concern with judicial interrogation is not with "the damaging truth that the questions might uncover." United States v. Martin, 189 F.3d 547, 554 (7th Cir. 1999). Accordingly, if a trial court's questioning of a witness exposes bad facts, inconsistencies, or weaknesses in the case itself, the exposure itself is not the worrisome prejudice. Prejudice becomes problematic when the court gives jurors the impression that it has an opinion on the correct or desirable outcome of the case. See id.; see also Rocha v. Great Am. Ins. Co., 850 F.2d 1095, 1100 (6th Cir. 1988). To this end, we have stressed that "where the judge participates actively, the judge's participation must be balanced; he cannot become an advocate or otherwise use his judicial powers to advantage or disadvantage a party unfairly." Cunan, 152 F.3d at 37 (internal quotation marks omitted). It is according to this "standard of fairness and impartiality" that we examine claims of prejudice. Id. More specifically, to be successful on appeal, a defendant must demonstrate that (1) the court's intervention gave the appearance of bias and (2) the apparent bias seriously prejudiced him.

### b. The Testimony Against Rivera-Rodríguez

The evidence specifically implicating Rivera-Rodríguez was limited to the testimony of two cooperating witnesses -- Cunta and Marruecos. Cunta testified that in 2006 Rivera-Rodríguez set up a

lookout scheme for the Praxedes Santiago drug point, involving the use of hand-held radios to listen for police and to communicate when they were in the area. According to Cunta, Rivera-Rodríguez would pay two lookouts stationed at the entrance of the housing project and provide them with radios each day. Cunta testified that on one occasion he saw hand-held radios charging in Rivera-Rodríguez's living room. Cunta also testified that Rivera-Rodríguez acted as a runner for cocaine in 2007.

Early in Cunta's testimony, the government sought to put his plea agreement into evidence and began asking him questions about it. During this line of questioning, the district court intervened to ask a series of leading questions. Recognizing the difficulties of capturing the dynamics of a trial from the cold record, we set forth at some length the exchanges, bench conferences, and defense objections that preceded the court's intervention:

> BY MS. MELENDEZ-RIVERA [special assistant United States Attorney]:
>
> Q. Sir, please take a look at what has been marked Government ID Number 30. Do you recognize it, sir?
>
> A. Yes, I recognize it. It's got my initials.
>
> MS. MELENDEZ-RIVERA: And we move to mark it as an exhibit.
>
> THE COURT: Sure. It's the Plea Agreement.
>
> MS. MELENDEZ-RIVERA: Yes, Your Honor.
>
> THE COURT: Received in evidence.

-14-

(At 1:42 PM, Government's Exhibit Number 30 admitted into evidence.)

MS. MELENDEZ-RIVERA: It's the Plea Agreement and the plea supplement, also.

THE COURT: Very well. So you plead guilty in this case, correct?

THE WITNESS: Yes, I plead guilty.

BY MS. MELENDEZ-RIVERA:

Q. Why did you plead guilty in this case, sir?

A. Because what I was doing is true.

Q. When you entered into a Plea Agreement with the Government, what did you get in exchange for the Plea Agreement, sir?

A. In exchange I was going to get a recommendation so my sentence would be lowered.

Q. How many years or months were you exchanging for the Plea Agreement?

A. I signed for five years.

MS. MELENDEZ-RIVERA: Let the record reflect that we are publishing to the jury what has been marked Government Exhibit Number 30.

MR. LINCOLN-SAN-JUAN: Your Honor, may we approach a moment?

(Bench conference held.)

THE COURT: Yes, Mr. Lincoln.

MR. LINCOLN-SAN-JUAN: This is not an accurate reflection, and the prosecutor must know that, what the Plea Agreement contains, number one, and --

THE COURT: What --

-15-

MR. LINCOLN-SAN-JUAN: And, second, it's not what he gets in exchange, because the Government has still to determine.

THE COURT: I don't expect him to answer those questions. Remember, he's a lay person. He says, I signed for four years. He should know that I give whatever I want.

MR. LINCOLN-SAN-JUAN: He didn't sign for five years as such. That's number one.

MS. MELENDEZ-RIVERA: Well --

MR. LINCOLN-SAN-JUAN: Let me explain.

MS. MELENDEZ-RIVERA: Okay. Go ahead.

MR. LINCOLN-SAN-JUAN: Number two, she's saying in exchange for your cooperation. That's not an exchange for cooperation.

MS. MELENDEZ-RIVERA: I didn't say cooperation, Your Honor.

MR. LINCOLN-SAN-JUAN: That's part of a general Plea Agreement without even getting into the cooperation part.

MS. MELENDEZ-RIVERA: I didn't say cooperation, Your Honor.

MR. LINCOLN-SAN-JUAN: So he's expecting to get below that actually.

THE COURT: I think all this is going to come out, if you let her do that.

MR. LINCOLN-SAN-JUAN: I'm not sure it's coming out.

THE COURT: If not, you can ask.

MR. LINCOLN-SAN-JUAN: But I want the leeway to get into that.

THE COURT: Absolutely.

-16-

MS. MELENDEZ-RIVERA: Well, Your Honor --

THE COURT: I'm sure that by the time we are over, everyone's going to get to know what this is.

MR. LINCOLN-SAN-JUAN: I don't want then objections, he's a lay person, and the Government can get to ask you very cleanly just five years --

MS. MELENDEZ-RIVERA: No, no, no, no. I mentioned --

MR. LINCOLN-SAN-JUAN: I'm just saying, I'll let you do whatever you want. Let me do my part.

MS. MELENDEZ-RIVERA: No, no. I --

THE COURT: It's okay. We understand each other. Go ahead.

(Bench conference concluded.)

BY MS. MELENDEZ-RIVERA:

Q. Sir, going back to your plea agreement, you mentioned that you recognized what has been marked Exhibit for the Government Number 30. When you entered into the Plea Agreement with the Government, who explained to you what was contained in this document?

A. The lawyer, my lawyer explained it to me and the AUSA.

MR. LINCOLN-SAN-JUAN: Can we have the name of the AUSA, if he knows, Your Honor?

THE COURT: Do you remember the name of the Assistant U.S. Attorney who explained that to you?

THE WITNESS: The name? Rosaida Melendez.

-17-

With this exchange having been completed, the court began its own questioning of the government's witness:

THE COURT: So let me see if I can help you. You pled before me, correct?

THE WITNESS: Yes.

THE COURT: And I explained to you what were the potential penalties that you could be getting if you pled guilty?

THE WITNESS: Yes.

THE COURT: And I explained to you also that irrespective of whatever your Plea Agreement said, I retained discretion to sentence you under the Statute any way that I want to sentence you, correct?

THE WITNESS: Yes.

THE COURT: And I also explained to you that if you were to cooperate, you had an obligation to give complete, truthful, honest answers to questions, correct?

THE WITNESS: Yes.

THE COURT: And if you didn't, you would then face additional penalties for perjury or for making false statements?

THE WITNESS: Yes.

THE COURT: And for obstruction of justice?

THE WITNESS: Yes.

THE COURT: I told you also, remember, that once your cooperation is over, the Government may or may not recommend that you be given some sort of reduction. Do you understand that?

THE WITNESS: Yes.

-18-

THE COURT: And it was then up to me to decide whether I would do that or not, correct?

THE WITNESS: Yes.

THE COURT: Okay. Go ahead. So when you say you signed for five years, that is your expectation?

THE WITNESS: Yes.

THE COURT: But it could be that or it could be triple that?

MR. LINCOLN-SAN-JUAN: Your Honor.

THE WITNESS: Yes.

THE COURT: Or it could be anything that I want to give you, correct?

THE WITNESS: That is so.

THE COURT: Okay.

MR. LINCOLN-SAN-JUAN: May I approach?

MR. BERKOWITZ [Rivera-Rodríguez's counsel]: Me, too.

(Bench conference held)

THE COURT: What is the problem now?

MR. LINCOLN-SAN-JUAN: Yes, Your Honor. I have great difficulty with the Court acting in essence as to setting the conditions to the defendant.

THE COURT: You can object to it.

MR. BERKOWITZ: We do.

MR. LINCOLN-SAN-JUAN: Yes, I am. This is what I'm noting.

THE COURT: Noted, and denied, because I see you people are having difficulty getting together on how to figure this out.

MR. LINCOLN-SAN-JUAN: That's the problem, Your Honor.

THE COURT: And I just want to move along, and I just wanted to get this out --

MR. LINCOLN-SAN-JUAN: But that is the problem. If they don't know how to set forth their case --

THE COURT: They know how to do it, and you know how to do it, too.

MR. LINCOLN-SAN-JUAN: But when you tell the jury this is your expectation, that -- we all know, or at least I know, let me speak for myself, that what you have just told the witness, while technically and judicially accurate, is far from reality.

THE COURT: Well, you'd be surprised. I don't know.

MR. LINCOLN-SAN-JUAN: I very rarely have met a cooperating witness, first of all, who expects to get what is on the front part of the Plea Agreement. They expect to get less.

THE COURT: You have rarely seen that I give a cooperating witness what the Government asks me to give them. I do what I want.

MR. LINCOLN-SAN-JUAN: I know. I've seen you give them one hour. But you've mentioned the possibility of higher. You've only mentioned the possibility of higher. You haven't mentioned lower.

THE COURT: You can ask him that.

MR. BERKOWITZ: It comes from more authority if it comes from you.

-20-

THE COURT: You want me to ask that, too? I'll ask that.[9]

MR. LINCOLN-SAN-JUAN: I think it should --

THE COURT: I think we are wasting time with this. I think you have made your point, and let's go.

(Bench conference concluded.)

The government's second cooperating witness, Marruecos, testified that he observed Rivera-Rodríguez distributing the hand-held radios and saw the radios charging in Rivera-Rodríguez's home. During the testimony of previous witnesses, DEA informant José Montañez-Santos and Puerto Rico Police Officer Marisol Torres, regarding the general operations of the drug conspiracy, the government introduced a hand-held radio found on Marruecos's person upon his arrest. When confronted with this evidence during cross-examination, however, Marruecos testified that it was <u>not</u> the same type of radio as those distributed by Rivera-Rodríguez (they were "a bit smaller"). He further claimed that Rivera-Rodríguez took the place of a woman named Celita as a runner for cocaine.

The district court intervened during Marruecos's testimony on two occasions. First, the court again intervened to emphasize the importance of a cooperating witness telling the truth. The entire

---

[9] It is unclear what precise question the court intended to ask, but it did not ultimately ask any further questions related to this inquiry.

exchange, culminating in the court's intervention at the end, proceeded as follows:

> [BY MS. MELENDEZ-RIVERA:]
>
> Q. Sir, I'm going to show you what has been marked Government ID Number 36. . . . Sir, do you recognize that document?
>
> A. Yes.
>
> Q. Why do you recognize it?
>
> A. Because my initials are on it.
>
> Q. Can you explain what is the document about?
>
> A. This is a plea that I signed for the time that I was going to be given, because I was guilty of what I was being accused.
>
> Q. Taking a look at what is being depicted in the screen, sir, is it the Plea Agreement that you signed?
>
> A. Yes.
>
> Q. When did you sign -- when did you sign this Plea Agreement, sir?
>
> A. Approximately a month ago. I signed this here, with the -- with the Judge.
>
> Q. Okay. Were you advised that this is only a recommendation that the United States Government will do to this Court regarding the sentencing in this case for you?
>
> A. Yes.
>
> Q. Sir, regarding the amount of drugs that were -- for which -- the one that you are held responsible, is that the same amount of drugs that you handled while you were at this drug trafficking organization?
>
> A. More than that was sold.

Q. So part of the plea -- it's correct if I state that part of the Plea Agreement was that you were going to be pleading guilty for a lesser amount than the one that you used to work with?

A. I don't understand.

THE COURT: You are admitting that you dealt with more drugs than that?[10]

THE WITNESS: Yes.

THE COURT: That's it. Go ahead.

BY MS. MELENDEZ-RIVERA:
Q. Regarding the recommendation about the months that you were going to be recommended, do you remember how much, how many?

A. From 87 to 108.

MR. LINCOLN-SAN-JUAN: The document -- the document is being viewed by the witness, and it has the month there.

THE COURT: He's being asked, and he's saying 87 to 108. Go ahead.

BY MS. MELENDEZ-RIVERA:
Q. Sir, regarding the Plea Supplement that you signed, what was required from you regarding the agreement with the Government?

A. To say the truth at all times.

Q. Regarding the kind of cooperation that the Government was expecting from you, did you receive any advice? What did -- the Government was expecting from you at the time you signed the Plea Agreement, sir?

---

[10] This intervention, and the two that follow it, served the purpose of clarifying testimony already given and were not problematic. They are not the focus of our analysis here.

MR. LINCOLN-SAN-JUAN: Your Honor, he has no way of knowing what the Government expects.

THE COURT: Well, I think he already answered the question.

BY MS. MELENDEZ-RIVERA:
Q. Were you advised that the United States Government is not compelled to file any motion on your behalf for your cooperation in this case?

A. Yes.

Q. Were you also advised that the only person that can -- that is going to be deciding about your sentencing is the Judge presiding in this courtroom?

A. Yes.

Q. Sir, were any threats made to you for your testimony?

A. No.

Q. Were you intimidated to testify, sir?

A. No.

Q. Sir, on how many occasions did you meet with the agents?  DEA agents or police officer agents.

A. On many occasions.

Q. On how many occasions did you meet with the prosecutors?

A. On many occasions.

Q. What were you told from the prosecutors or the DEA agents?

MR. LINCOLN-SAN-JUAN: Your Honor, this is self-serving, merely self-serving. We know the truth --

THE COURT: The thing is that everybody here knows, everybody here knows and is quite clear that he's testifying, the Government always expects him to say the truth, and of course he's hoping that I consider that at the appropriate time that I make a sentence if you make a recommendation. That's all. That's what happens.

The court's second challenged intervention during the questioning of Marruecos occurred while the government was trying to establish the proximity of the lookouts and their hand-held radios to Rivera-Rodríguez's home. Marruecos was having trouble marking the location of the home on an exhibit when the court intervened as follows:

MS. MELENDEZ-RIVERA: You mentioned that you went to Carlos Rivera-Rodríguez house. Can you show where is that [showing the witness an exhibit]?

[THE WITNESS THROUGH THE INTERPRETER]:[11] It -- the mark came a little bit -- it was made a little bit down.

MS. MELENDEZ-RIVERA: You can erase it.

[THE WITNESS THROUGH THE INTERPRETER]: Do we erase?

MS. MELENDEZ-RIVERA: Yes.

THE COURT: I think -- is the house more or less in front of the place where you had seen the scanners?

---

[11] This portion of the transcript, and some others when the witness was apparently speaking in Spanish but not directly answering a question, attributes the testimony to the interpreter herself. The parties do not address this discrepancy. We will therefore treat this portion of the transcript as if it conveys, as the context suggests, the translated statements of the witness.

THE WITNESS: Yes.

### c. Rivera-Rodríguez's Defense

In response to the testimony of the two cooperating witnesses, Rivera-Rodríguez took the stand to tell his side of the story. He testified that he was "totally against drugs" and described his eldest son's struggle with addiction. He took his son to drug-rehabilitation programs and tried to help him quit. He also testified that he would go to the Praxedes Santiago drug point and tell the dealers not to sell to his son. On one such occasion, he got into a heated exchange (a "run-in") with Marruecos. He insisted that he never invited any of the drug dealers from the drug point, including Marruecos and Cunta, into his home because he did not want any of them there. He further testified that he sold jewelry ("fantasía") out of his car and trailer to earn money. At times he would take the car into the Praxedes Santiago Public Housing Project to sell items and collect payments. According to Rivera-Rodríguez, a woman named Celita, who was charged in the indictment here as a drug runner, was one of his regular customers. He testified that he would go to her home, but not inside it, to deliver her purchases and collect payment from her -- testimony that would become central to the court's final intervention. He denied running drugs with or for her at any time.

Rivera-Rodríguez also called Keila Flores-Ramos, the vice president of the Praxedes Santiago Public Housing Project, to

testify on his behalf.  She testified that she was aware of the drug point within the housing project and had seen many of the drug dealers and users, but she had never observed Rivera-Rodríguez selling drugs or otherwise be involved in the drug trade.  He nonetheless went into the housing project daily to collect his son, who was a drug addict.  Lastly, she testified that Rivera-Rodríguez sold fantasía in the housing project and that he "visited"[12] Celita approximately once a week to bring jewelry and collect payment.

### d.  The Government's Closing Argument

During the government's closing argument, it characterized Rivera-Rodríguez's testimony as inconsistent with that of his own witness -- Flores-Ramos -- by specifically focusing on whether he ever went inside Celita's home:

> [MS. MELENDEZ-RIVERA:]  Going back to Keila Flores, their witness, I submit here she testified seeing Carlos Rivera-Rodríguez going into Celita's house. Do you remember Celita's name? The defendant yesterday took the stand. I submit that in cross-examination, he denied entering into Celita's house.

Attorney Berkowitz objected in open court and was not asked to provide the basis for the objection.  The court then overruled defense counsel's objection and went on to remark, "That's exactly what he said."  Although the court's statement is accurate -- Rivera-Rodríguez did deny entering Celita's home -- its

---

[12] This is the precise term used in the yes-or-no questions put to Flores-Ramos, which she answered affirmatively.

intervention seemed to confirm the government's insistence that there was a discrepancy between Rivera-Rodríguez's testimony and Flores-Ramos's as to whether he had entered Celita's home.[13]

This alleged discrepancy was important because of its possible effect on the jury's evaluation of Rivera-Rodríguez's credibility. Also, the government's insistence that Rivera-Rodríguez entered Celita's home had substantive significance. As we have described, Celita functioned as a drug runner and Rivera-Rodríguez was accused of helping her in that enterprise, which would likely have involved retrieving packages of drugs from her home. Flores-Ramos never testified that she had seen Rivera-Rodríguez inside Celita's home. Instead, she had answered affirmatively when asked whether he "visited" her as part of his fantasía business. Rivera-Rodríguez testified that he had indeed

---

[13] Defense counsel addressed the subject again with the court after closing arguments and outside the presence of the jury during a bench conference on another issue:

> MR. BERKOWITZ: Your Honor, while we're here, I want to make sure we have clear on the record my objections during the closings was to the two mentions that my client went into Celita's house.
> THE COURT: Well, that's what I understood the evidence to say.
> MR. BERKOWITZ: I understood different.
> THE COURT: Well, you know, that's why I said [(the court did not finish this train of thought)] . . .

This exchange confirms that the court intended to convey its understanding of the evidence, which was favorable to the government, to the jury.

been <u>outside</u> the house to deliver jewelry and collect payment. He insisted that he had never been inside the home.

## 2. The Appearance of Bias

The case against Rivera-Rodríguez required the jury to weigh the testimony of two cooperating witnesses against the testimony of Rivera-Rodríguez and Flores-Ramos. In such a classic credibility contest between the government's witnesses and the defendant's, the court must take particular care to avoid any appearance that it favors the government's view of the case. <u>See</u>, <u>e.g.</u>, <u>United States v. Tilghman</u>, 134 F.3d 414, 418-19 (D.C. Cir. 1998) (finding judicial intervention impermissible when it "may have given the jury the impression that the judge doubted the defendant's credibility. The judge's questions could have been particularly damaging because . . . credibility [was] unusually critical to his defense" (internal quotation mark omitted)); <u>see</u> <u>also</u> <u>United States v. Barnhart</u>, 599 F.3d 737, 745 (7th Cir. 2010) (finding that the court's conduct suggested to the jury that he doubted the plausibility of the defendant's version of events -- it "went beyond mere clarification and instead gave the impression that the judge disbelieved [the] defense"). Here the court did not exercise the requisite care.

### a. The Court's Questioning about Plea Agreements

It is common practice for the government to question cooperating witnesses about the terms of their plea agreements to

preemptively fend off defense counsels' inevitable attacks on their credibility. See, e.g., United States v. Kinsella, 622 F.3d 75, 77 (1st Cir. 2010) (describing how defense counsel "aggressively confronted [a cooperating witness] on cross-examination, using the plea agreement and light sentence to attack his credibility"); United States v. LiCausi, 167 F.3d 36, 47 (1st Cir. 1999) (upholding a conviction based on cooperating witness testimony where "the government elicited on direct examination the cooperation arrangements for each witness and introduced into evidence their plea agreements"). By introducing the plea agreement and reviewing it with a cooperating witness on direct examination, the government both defends against the argument of the defense that a cooperating witness would say anything to get a deal, and attempts to reinforce the credibility of the witness by emphasizing the importance of testifying truthfully.

Here, after becoming frustrated with the government's attempt to engage in this type of questioning, the court intervened and took over the prosecutor's role. Indeed, the court first interjected by saying, "Let me see if I can help you."[14] The court then asked the cooperating witness a series of leading questions designed to emphasize to the jury the obligation of the witness to

---

[14] It is unclear whom the judge was attempting to "help" -- the government or the cooperating witness. The distinction is not material to our analysis as helping either would benefit the government's case.

tell the truth, and the consequences for the witness if he did not. In the instance of the second cooperating witness -- Marruecos -- the court intervened at the end of the government's inquiry about his plea agreement to make a statement that also emphasized the importance of telling the truth as a cooperating witness.

Jurors would expect the government's attorney to pose questions to cooperating witnesses emphasizing their obligation to tell the truth. When the court visibly and forcefully assumes the prosecution's role, as it did here, the court runs the risk of suggesting to the jury that the court itself has a stake in the jurors' understanding of the obligation of the government's witnesses to tell the truth. Indeed, as Attorney Lincoln-San-Juan emphasized during the sidebar conference on his objection to the court's questions, it is problematic for the court to emphasize to the jury the stake that the cooperating witness has under the plea agreement in testifying truthfully, without equally emphasizing, as defense counsel would surely do, the incentive that the witness has to say anything, truthful or not, that might help the government's case and thus curry favor with the prosecutor who might recommend a lower sentence.[15]

As the excerpts above demonstrate, though the court did ask the witness one question pertaining to the government's ability to

---

[15] As the transcript reveals, see supra, Attorney Berkowitz, Rivera-Rodríguez's counsel, joined the objection.

recommend a reduced sentence on the basis of his cooperation, its inquiry focused much more heavily on the witness's obligation to tell the truth. Moreover, when the court again intervened during Marruecos's testimony, it stressed that "everybody here knows and is quite clear that he's testifying, the Government always expects him to say the truth," without any reference to the potential benefit to the witness, in the form of the government's recommendation for a reduced sentence, if he gives testimony that helps the government's case. Given this extended one-sided inquiry about truthfulness, the court's intervention served to enhance the credibility of the government's key witnesses, and thereby had an effect similar to the judicial conduct found impermissible in Barnhart, 599 F.3d at 745. See supra.

> **b.** **The Court's Intervention during Testimony about the Location of Rivera-Rodríguez's House**

The location of Rivera-Rodríguez's house, which was right outside the gates to the Praxedes Santiago Public Housing Project, was important to the government's case because that location linked Rivera-Rodríguez to the lookouts. As recounted above, the witness, Marruecos, was apparently having trouble marking the location of the house on an exhibit, as the government had asked him to do. To get over this hurdle, the court again assumed the prosecutor's role and asked a leading question ("[I]s the house more or less in front of the place where you had seen the scanners?") that made the

-32-

government's point about the proximity of Rivera-Rodríguez's house to the hand-held radios.

Thus, the court's question had the effect of moving the prosecutor and the witness away from the line of discussion that was suggesting confusion and imprecision on an important point and towards a description of the location credibly anchored in the witness's testimony. In short, the court's question was a much more effective way to accomplish what the prosecutor was trying to accomplish, and it added to the overall sense that the judge was helping the government make its case.

### c. The Court's Intervention during Closing Arguments

As described above, the government was attempting to paint Rivera-Rodríguez as a liar, a portrayal important to its case because he took the stand in his own defense. The government also wanted to establish that he went inside Celita's home because that was presumably where she kept the drug packages she delivered as a runner.[16] To make these arguments the government tried to identify an inconsistency between Rivera-Rodríguez's testimony and the testimony of the defense's only other witness -- Flores-Ramos. Defense counsel objected to the government's characterization of the testimony of both witnesses.

---

[16] The government's cooperating witness, Cunta, had testified that Celita and Rivera-Rodríguez both operated as runners and that she wanted to move the drugs from her house to his in light of police activity in the Praxedes Santiago Public Housing Project.

In dealing with this fairly routine objection to a closing argument that characterizes testimony, the court did not simply tell the jury, as judges usually do in this circumstance, that it was their duty to decide what the witnesses said.  See, e.g., United States v. Joyner,  191 F.3d 47, 53-54 (1st Cir. 1999) (finding that "the district court quickly and adequately addressed" a similar objection during closing arguments by immediately instructing the jury, "Members of the jury, you will take your own recollection of the evidence and not what either counsel has told you the evidence is").  Instead, the court overruled the objection and then went on to remark, "That's exactly what he said."  With this intervention, the court once again helped the government with its case by appearing to agree with the government that there was an inconsistency between Rivera-Rodríguez's testimony and Flores-Ramos's testimony on an issue important to the government's theory of the case -- whether Rivera-Rodríguez had entered Celita's home. This intervention was also unreasonable fact-finding by the court on an issue that should have been left to the jury.  See Quercia, 289 U.S. at 470 ("[A trial judge] may not assume the role of a witness. He may analyze and dissect the evidence, but he may not either distort it or add to it.").  Making matters worse, the court's statement came during closing arguments -- just before the case went to the jury.

### d. The Cumulative Effect of the Court's Interventions

Our inquiry as to the effect of the court's interventions takes into account the record as a whole, assessing the cumulative effect of the interventions on the trial. See Polito, 856 F.2d at 418 (noting that "[c]harges of partiality should be judged not on an isolated comment or two, but on the record as a whole"). Although the court's interventions thus should not be viewed in isolation, their cumulative effect cannot be understood without first assessing their individual significance in the context of the trial at the time they occurred.

The four interventions[17] of the judge just described all had a common theme -- the court helping the government with its case. First, through questioning and statements, the court emphasized to the jury the truth-telling obligations of the cooperating witnesses. Next, the court asked a leading question to help establish the proximity of Rivera-Rodríguez's house to the location where the lookouts were stationed. Finally, the court suggested that the prosecutor accurately recounted an inconsistency in the defendant's case. Taken together, these interventions, and the consistent appearance they conveyed of the court helping the government with its case, inescapably conveyed an appearance of

---

[17] The four interventions we refer to include the two interventions (one with each cooperating witness) regarding truth-telling obligations, the intervention during the questioning of Marruecos about the location of Rivera-Rodríguez's home, and the intervention during the government's closing argument.

judicial bias to the jury in favor of the government and against Rivera-Rodríguez.

### 3. Serious Prejudice

Having determined that the court's interventions impermissibly gave the appearance of judicial bias to the jury, and hence were akin to trial error, we now turn to the question of serious prejudice.

We begin by considering the evidence against Rivera-Rodríguez, which was far from overwhelming. There were no video or audio recordings that implicated Rivera-Rodríguez in the conspiracy. The government's case depended almost entirely on the testimony of two cooperating witnesses.[18] Impatient with the government's awkward questioning of Cunta, the first cooperating witness, the court intervened in a manner that bolstered his credibility, and then later similarly intervened to bolster the credibility of Marruecos, the second cooperating witness. Moreover, when intervening, the court employed leading questions, which are generally not permissible on direct examination. See Fed. R. Evid. 611(c). The court's assumption of the prosecutor's role in questioning the cooperating witnesses, and its use of leading questions to facilitate the inquiry, undoubtedly made the

---

[18] The only other piece of evidence introduced against Rivera-Rodríguez was the hand-held radio that was admittedly different from the ones allegedly used by Rivera-Rodríguez.

trial more efficient, but they also created the impression that the court favored the government's version of events.

Importantly, there were a number of crucial points of fact on which the testimony of the cooperating witnesses and that of Rivera-Rodríguez and Flores-Ramos were at odds. According to Rivera-Rodríguez, he entered the housing project only to either retrieve his son, who was addicted to drugs, or to sell jewelry to residents. The cooperating witnesses claimed that he entered the Praxedes Santiago Public Housing Project daily to deliver the scanners and pay the lookouts. Marruecos also testified that Rivera-Rodríguez briefly served as a drug-runner for cocaine, working with Celita. On these disputed facts the court intervened to help the government make its case, first by emphasizing the proximity of Rivera-Rodríguez's house to the location of the hand-held radios, and then by incorrectly suggesting to the jury that Rivera-Rodríguez's own witness, Flores-Ramos, had contradicted his insistence that he never entered Celita's home.

The judge's continued one-sided interventions here -- repeated even after counsel lodged an objection to the judge's first foray -- cumulatively gave jurors the impression that the court favored a guilty verdict, and hence made the jury more inclined to believe the government's version of events. Without those improper interventions, there is a reasonable probability

that Rivera-Rodríguez would not have been convicted.[19]  Accordingly,

we must vacate Rivera-Rodríguez's conviction.[20]

---

[19] In its brief and at oral argument, the government contended that the court's jury instructions at the outset of the trial mitigated any potential prejudice caused by its later interventions.  Specifically, the court instructed the jury "not [to] read from my intervention that I may have any message as to what your verdict should be."  The D.C. Circuit and the Second Circuit have adopted the position that where "the trial judge asked questions, objected to by counsel, that could have influenced the jury's assessment of the defendant's veracity, such interference with jury fact-finding cannot be cured by standard jury instructions."  Tilghman, 134 F.3d at 421 (adopting by reference the Second Circuit's approach in United States v. Filani, 74 F.3d 378, 386 (2d Cir. 1996)); see also United States v. Hoker, 483 F.2d 359, 368 (5th Cir. 1973) (holding that "[n]o amount of boiler plate instructions to the jury -- not to draw any inferences as to the judge's feelings about the facts from his asking questions, or that they are free to disregard factual comment by the judge, or as to the presumption of innocence -- could be expected to erase from a jury's mind the part taken in this trial by the district judge").  Categorical rules are not helpful in cases such as this.  Sometimes the court's jury instructions about how the jury should regard the court's interventions and questioning may mitigate prejudice and other times they may not.  In this case they did not serve to mitigate the serious prejudice.

[20] Because we hold that Rivera-Rodríguez's conviction must be vacated on the basis of the district court's improper intervention, we need not reach the other issues he presented on appeal, including whether there was prosecutorial misconduct rising to a level that would also warrant a new trial.

## B.  Mercado-Cruz's Claims[21]

### 1.  Timeliness of § 851 Information

Just prior to jury impanelment, the following exchange took place concerning the government's filing of its information pursuant to 21 U.S.C. § 851, listing the prior convictions that would trigger a life sentence for Mercado-Cruz:

> THE COURT: Let me ask Mr. Lincoln whether he talked to his client, because we have been dealing with this, you know, for a long, long time.
>
> MR. LINCOLN-SAN-JUAN: Yes, I talked to him many times, and he rejected a plea offer of 77 to 96 a while back.  I thought if he had been convicted, because he was facing [another trial in state court], he might consider pleading here. I don't know. The prosecutors tell me today that they would still be willing to, . . .
>
> MR. BAZAN-GONZALEZ: Are we going to . . .
>
> MR. LINCOLN-SAN-JUAN: Let me talk to the defendant, and I will signal you and we can proceed to trial. I'm not going to argue he didn't receive notice.
>
> MR. BAZAN-GONZALEZ: So we may start with the jury once Mr. Lincoln has spoken with his client --

---

[21] To the extent that Mercado-Cruz attempts to adopt Rivera-Rodríguez's argument that the improper judicial intervention rendered his trial fundamentally unfair, we decline to entertain the argument.  We have long held that co-defendants cannot simply adopt each others' arguments wholesale.  "[T]o be meaningful, the arguments adopted must be readily transferrable from the proponent's case to the adopter's case." <u>United States</u> v. <u>David</u>, 940 F.2d 722, 737 (1st Cir. 1991).  The case against Mercado-Cruz was markedly stronger than the case against Rivera-Rodríguez.

THE COURT: You don't have to file before starting. That's the agreement --

MS. MELENDEZ-RIVERA: Fine.

MR. LINCOLN-SAN-JUAN: We've seen the document, and I've explained to my client all that --

THE COURT: That's fine. Let's proceed.

Mercado-Cruz argues that he was improperly sentenced to life in prison because the government failed to timely file the § 851 information, and, therefore, the criminal history included therein should not have been attributed to him.  Section 851(a) provides that, as a prerequisite for seeking a mandatory sentence based on a defendant's prior drug convictions, "before trial, or before entry of a plea of guilty, the United States attorney file[] an information with the court (and serve[] a copy of such information on the person or counsel for the person) stating in writing the previous convictions to be relied upon."  21 U.S.C. § 851(a). Though these temporal requirements have been strictly enforced, we have held that "[b]ecause [they] exist for the defendant's benefit, it makes perfect sense to give the defendant the power to waive (and the obligation not to forfeit) strict compliance with them." Prou v. United States, 199 F.3d 37, 47 (1st Cir. 1999); see also id. at 46 (expressly rejecting the argument that "an enhancement based on an untimely filing . . . is null and void").

Here, it is undisputed that the § 851 information was not timely filed.  Mercado-Cruz's appeal thus turns on whether he

waived any objection to the § 851 information on the basis of its untimeliness. As the above colloquy reveals, the government was prepared to file its § 851 information prior to jury selection, but Mercado-Cruz's counsel requested, and the government agreed, that the filing be delayed until he had the chance to speak with his client one final time about a potential plea deal. In making this request, Mercado-Cruz's counsel expressly stated that he would not dispute that Mercado-Cruz had received notice of the § 851 information. The court then described the agreement between the parties, saying to the government, "[y]ou don't have to file before starting. That's the agreement." Accordingly, it is evident that Mercado-Cruz's counsel intended to waive the temporal requirements of § 851(a).

In United States v. Jones, 674 F.3d 88, 95 (1st Cir. 2012), we held that there can be a valid agreement, made in aid of plea bargaining, to waive the temporal requirements of § 851(a) and postpone the deadline for filing the information. Mercado-Cruz nonetheless urges that what transpired here did not constitute such an agreement because it differed from Jones in two respects. First, he argues that he never personally endorsed the agreement to postpone the filing, whereas in Jones the defendant signed the agreement. Second, he argues that the agreement did not constitute an "explicit waiver."

The latter argument is more easily disposed of.  As discussed above, the exchange, in open court, between the court, the government, and defense counsel was clearly an attempt to postpone the filing and waive any objection to its untimeliness. Accordingly, it suffices as an agreement to explicitly waive any timeliness objection.

As to the former argument, we find no support in case law for the proposition that a defendant must personally waive the temporal requirements of § 851.  Rather, our previous decisions dealing with those requirements focus on the issue of notice, and whether the defendant was made aware of the government's intention to file a § 851 information before electing to go to trial or enter a guilty plea.  See, e.g., Prou, 199 F.3d at 44 n.3 ("[C]ourts occasionally have excused untimely filings as long as the defendant has been made aware before trial or entry of a guilty plea of both the government's intent to seek an enhancement and the particular prior conviction(s) upon which the government aspires to rely.").  In Prou, we reaffirmed that the requirements of § 851(a) were subject to procedural default in the habeas corpus context (i.e., counsel's failure to object as to the timeliness of a § 851 information at trial or on direct appeal will render such a claim defaulted). 199 F.3d at 47.  If counsel's actions can render a claim as to timeliness defaulted, it follows that counsel can agree to forego

an objection if it is in the interest of his or her client to delay the filing of a § 851 information.[22]

Following these precedents, we hold that when, as here, defense counsel and the government agree to postpone the filing of a § 851 information, the temporal requirements of § 851(a) are deemed waived and replaced by the agreed-upon filing deadline. Because here the government filed its § 851 information at the agreed-upon time, we reject Mercado-Cruz's challenge to his life sentence on the basis of the untimely filing of the information.

## 2. Application of Fair Sentencing Act (FSA)

Mercado-Cruz challenges his term of imprisonment based on the Sentencing Guidelines changes implemented by the Fair Sentencing Act of 2010 ("FSA"), which he contends should have applied to modify his sentence. See 18 U.S.C. § 3582(c)(2). This argument is moot as to his term of life imprisonment on Count One because of our holding above that the § 851 information was not invalidated by the timing of its filing. Due to the prior convictions enumerated in the information, Mercado-Cruz was subject to a mandatory life sentence regardless of any changes to the drug quantity guidelines. See Jones, 674 F.3d at 95 ("[U]nder 21 U.S.C. § 841(b)(1)(A), a defendant who has the requisite drug quantity and 'two or more

---

[22] We express no opinion on whether an ineffective assistance of counsel claim in a habeas corpus petition could have its basis in a counsel's actions as to waiver of the procedural requirements of § 851(a). No such claim is part of this appeal.

prior convictions for a felony drug offense' must be sentenced to life in prison.").

However, the concurrent sentences of 262 months on Counts Three and Four could potentially have been affected by the FSA changes.  Those sentences were based, in part, on the jury's finding that Mercado-Cruz possessed with intent to distribute at least five kilograms of cocaine and at least fifty grams of cocaine base.  In the FSA, Congress amended the statutory mandatory minimums for cocaine base under 21 U.S.C. § 841(b)(1); however, it did not change the penalties for cocaine.  Accordingly, the relevant drug quantity for the concurrent sentences on Counts Three (cocaine base) and Four (cocaine), which were calculated using a grouping approach, would not have changed.  See U.S.S.G. § 5G1.2(b); U.S.S.G. § 5G1.2 cmt. n.3(C) (2012) (advising that a mandatory minimum sentence on one count should apply to the group sentence on all counts).  Accordingly, Mercado-Cruz cannot show that the FSA should have applied to reduce his sentence.

## 3.  Other Preserved Claims of Error

Mercado-Cruz, through counsel and by way of his pro-se brief, raises a number of other claims of error at trial, which were raised below and hence preserved for our review.  Though we find that none of those preserved claims provide a basis for a new trial, we will briefly address them in turn.

## a. Appearing Before the Jury in Prison Attire

Mercado-Cruz objected to the jury impanelment on the first day of trial because he was dressed in prison attire. The district court overruled the objection, stating that Mercado-Cruz had been informed of his right to wear ordinary clothing, and it was his responsibility to obtain that clothing. Mercado-Cruz responded by alleging that he did not know trial was set to begin on that day, despite the fact that the trial had long been set to begin in October 2010, and the court had set the specific date in a published order five days prior.

Although we have indeed held that a defendant has a constitutional right not to be forced to wear "identifiable prison garb" before the jury, United States v. Pina, 844 F.2d 1, 8 (1st Cir. 1988), we have stressed that "[a] due process violation occurs not from an accused's appearance in prison clothes but from the compulsion that he so appear," United States v. Rodríguez-Durán, 507 F.3d 749, 777 (1st Cir. 2007) (citing Estelle v. Williams, 425 U.S. 501, 512-13 (1976)). Here, the court afforded Mercado-Cruz an opportunity to wear different clothing and he failed to take advantage of it. He had a substantial amount of time to arrange for regular clothing to be available for him before the October trial.[23] Accordingly, no due process violation occurred.

---

[23] Mercado-Cruz did not argue that he did not own any street clothes or that he lacked the resources to obtain them. Thus, we need not decide, as some circuits have, whether a defendant in such

### b. Testimony About his Criminal History

Mercado-Cruz cites the government's alleged solicitation of admittedly inadmissible testimony about his criminal record. He argues that the court erred in not granting a mistrial on the basis of this testimony, or at least specially instructing the jury to disregard it. The testimony at issue was limited to one response by FBI Agent Francisco Aponte, a witness for the government. Asked by what names he knew Mercado-Cruz, Agent Aponte testified, in part, "It's not until I am working at the Strike Force, that we begin the investigation, and from the criminal records, I notice that the real name is Albert Mercado Cruz." Defense counsel immediately objected and moved for a mistrial. At a sidebar conference, the district court denied the motion for a mistrial, ruling that the offending remark was spontaneous. The court nonetheless directed counsel to instruct the witness (by way of a written note) that he was not to mention the defendant's criminal record. No further discussion of the matter occurred, and the court gave no curative instruction, nor was one requested.

---

a situation would be constitutionally entitled to have the court provide street clothing for him. See, e.g., Bentley v. Crist, 469 F.2d 854, 856 (9th Cir. 1972) (holding that "an accused who is forced to stand trial in prison garb because of financial inability to obtain other attire is under a compulsion equal to that of the prisoner who is not allowed to don readily available civilian attire").

Under the circumstances, it was within the court's discretion to deny the motion for a mistrial. <u>United States</u> v. <u>Glenn</u>, 389 F.3d 283, 287 (1st Cir. 2004) ("We will reverse a denial of a motion for a mistrial only when the defendant shows clear prejudice rendering the district court's denial a manifest abuse of discretion."). The more difficult question is whether the court erred in failing to, <u>sua sponte</u>, give a curative instruction. "[C]ourts have long recognized that, within wide margins, the potential for prejudice stemming from improper testimony or comments can be satisfactorily dispelled by appropriate curative instructions." <u>United States</u> v. <u>Sepúlveda</u>, 15 F.3d 1161, 1184 (1st Cir. 1993). We have also suggested that when improper testimony prompts a motion for a mistrial, it is advisable for the court to give a curative instruction; however, we have never held that such an instruction is always necessary. <u>Cf.</u> <u>United States</u> v. <u>Torres</u>, 162 F.3d 6, 12 (1st Cir. 1998) ("Where . . . a curative instruction is promptly given, a mistrial is warranted only in rare circumstances implying extreme [as opposed to simply clear] prejudice.").

In declining to give a curative instruction <u>sua sponte</u>, the court apparently determined that drawing more attention to the spontaneous comment would do more harm than good. During the aforementioned sidebar conference the court repeatedly said that the best course was "not to touch [the improper testimony] with a

ten-foot pole."  Examining the factors relevant to the court's decision here, we find no abuse of discretion, particularly in light of the fact that a curative instruction was not specifically requested by defense counsel.  Most importantly, the objectionable testimony consisted of one stray remark referring vaguely to Mercado-Cruz's "criminal records" without including any details of his criminal record.  We think the risk of prejudice was not so high as to require the court to give a special curative instruction.  Accordingly, Mercado-Cruz's claim that the court improperly dealt with the objection fails.

### c.  Cumulative Error

As a last ditch effort, Mercado-Cruz argues that, even if the trial errors he alleges (both preserved and unpreserved) in isolation were not prejudicial, their cumulative effect was. Sepúlveda, 15 F.3d at 1195-96 ("Individual errors, insufficient in themselves to necessitate a new trial, may in the aggregate have a more debilitating effect.").  When confronted with a cumulative error claim on appeal,

> we must consider each such claim against the background of the case as a whole, paying particular weight to factors such as the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the district court dealt with the errors as they arose (including the efficacy -- or lack of efficacy -- of any remedial efforts); and the strength of the government's case.

<u>Id.</u> at 1196.  Here, as explained above and below, we find that the district court's actions were not errors.  Accordingly, we need not conduct a cumulative error analysis.

**4.  Unpreserved Claims of Error**[24]

### a.  Scope of Cross-Examination

Mercado-Cruz claims that the cross-examination of witness Keila Flores-Ramos exceeded the scope of direct examination.  As described above, Rivera-Rodríguez called Flores-Ramos to testify in his defense.  On direct examination, Rivera-Rodríguez's counsel asked Flores-Ramos questions about the Praxedes Santiago Public Housing Project, where she lived and worked, specifically focusing on Rivera-Rodríguez's activities there.  She testified that she had never seen Rivera-Rodríguez engaged in the drug trade there.  On cross-examination by the government, she was asked whether anyone in the courtroom was someone whom she had seen at the drug point in her housing project.  She identified Mercado-Cruz.

_____

[24] Through his counsel and his pro-se brief, Mercado-Cruz raises a myriad of other claims.  None of these claims were preceded by corresponding objections.  Hence, to the extent that these claims are adequately developed in the briefs, as opposed to raised in a perfunctory manner, we review them for plain error; otherwise we need not address them.  <u>See</u> <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").  Specifically, we find that the following claims were raised too perfunctorily to warrant review:  (1) that the court should have <u>sua sponte</u> applied a minor role reduction, (2) that the late receipt of the Presentence Investigation violated Federal Rule Criminal Procedure 32(e) and, therefore, that Mercado-Cruz merits resentencing, and (3) that a firearms enhancement should not have been found applicable to him.

-49-

Defense counsel did not object.  At the time of the question, the witness had previously testified, on direct examination, about the presence of the drug point and identified Rivera-Rodríguez as someone who came into the housing project but did not, to her knowledge, engage in the drug trade.  Considering this prior testimony, it was not plain error for the court to permit, absent any objection, the question about Mercado-Cruz's presence at the drug point.

### b.  Eighth Amendment Violation

Mercado-Cruz argues that a term of life imprisonment violates his Eighth Amendment right to be free from cruel and unusual punishment.  The Supreme Court has held that "the Eighth Amendment prohibits imposition of a sentence that is grossly disproportionate to the severity of the crime."  Rummel v. Estelle, 445 U.S. 263, 271 (1980).  We have guidance on the proportionality issue, having previously upheld, on the basis of the same statute providing the mandatory sentence here, "a life sentence for a 30 year old defendant, based on a first time drug distribution conviction," relying in part on the fact "that the Supreme Court has upheld as constitutional sentences that look equivalently severe."  Jones, 674 F.3d at 95-96 (citing Harmelin v. Michigan, 501 U.S. 957 (1991) (upholding a sentence of life in prison without parole for possession of more than 650 grams of cocaine)).

Confronted with this precedent, we cannot say that imposing a life sentence on Mercado-Cruz for similar drug possession and distribution charges violated his Eighth Amendment right to be free from cruel and unusual punishment.

### c. Error in Drug-Quantity Determination

Mercado-Cruz argues that, at sentencing, the drug quantity attributed to him was not supported by proper findings related to his personal involvement in the conspiracy. See United States v. Colón-Solís, 354 F.3d 101, 103 (1st Cir. 2004) (holding that "when a district court determines drug quantity for the purpose of sentencing a defendant convicted of participating in a drug-trafficking conspiracy, the court is required to make an individualized finding as to drug amounts attributable to, or foreseeable by, that defendant"). That argument is inapplicable here because the jury rendered a special verdict specifically finding that Mercado-Cruz possessed with intent to distribute at least five kilograms of cocaine and at least fifty grams of cocaine base. Accordingly, there was no plain error in the drug-quantity determination.

### d.  Error in Criminal History Calculation[25]

Mercado-Cruz argues that the calculation of his criminal history category included three points from a conviction that was greater than ten years from the commencement of the current offense and resulted in a prison sentence of less than one year and one month, putting it outside the parameters contemplated by U.S.S.G. § 4A1.2.

The conviction at issue is a 1997 drug conviction from Pennsylvania that resulted in an initial sentence of three to twelve months. However, parole revocation hearings associated with that conviction occurred in Pennsylvania in 1998 and in Puerto Rico in 2005. At the latter, Mercado-Cruz was sentenced to time served.

In calculating a criminal history category under § 4A1.1, the court "[a]dd[s] 3 points for each prior sentence of imprisonment exceeding one year and one month," § 4A1.1(a), and "2 points for each prior sentence of imprisonment of at least sixty days not counted in (a)," § 4A1.1(b). Here, the court added three points for the conviction at issue, which combined with other prior convictions not at issue here, resulted in a total score of eight points and a criminal history category of IV (total of seven to nine points).

---

[25] Although criminal history category is irrelevant to the mandatory life sentence imposed on Count One, it could potentially have affected the Guideline range that ultimately produced Mercado-Cruz's combined 262-month sentence on the other counts.

According to § 4A1.2, a prior conviction resulting in imprisonment of less than one year and one month that was greater than ten years from the commencement of the current offense cannot be counted under § 4A1.1(b).[26] Mercado-Cruz thus argues that the conviction at issue (1) resulted in a sentence of less than one year and one month -- putting it in the two-point category of § 4A1.1(b) -- and (2) was imposed more than ten years before the current offense commenced. As a result of those two alleged facts, he contends, the conviction should not have been counted.

As the government points out, however, there are two problems with Mercado-Cruz's argument. First, it is not clear that the sentence, including the resentencing as a result of his parole being revoked, was less than one year and one month. Second, even if it was less than one year and one month, there was ample evidence in the record that the offense of conviction began around 2005, which was the same year that the sentence for his second parole revocation was imposed. Accordingly, even if the court erred in attributing three points to the prior conviction under § 4A1.1(a), the correct result would have been to attribute two points to the conviction under § 4A1.1(b). The resultant change in his total points (from eight to seven) would not have affected his criminal history category - IV (seven to nine points).

---

[26] Convictions that resulted in imprisonment for longer than one year and one month cannot be counted if they are more than fifteen years older than the current offense.

Accordingly, we conclude that there was no plain error in the determination of Mercado-Cruz's criminal history category.

### e. Prosecutorial Misconduct

Mercado-Cruz contends that the government engaged in prosecutorial misconduct by soliciting testimony about his criminal history and relying on testimony it knew to be false. We have already addressed the issue regarding the testimony about his criminal history and found it not to be reversible error. See supra, Section II, Part B.3.b. With regard to the reliance on allegedly false testimony, there is nothing in the record to indicate that the testimony cited by Mercado-Cruz was definitively false. Even if such definitive contradictory evidence existed, there is certainly nothing to indicate that the government was aware at the time of trial that the testimony was false. Accordingly, we find no plain error in the prosecutor's conduct here.

### III.

The conviction and sentence of defendant Rivera-Rodríguez are vacated; his case is remanded to the district court for proceedings consistent with this opinion. The conviction and sentence of defendant Mercado-Cruz are affirmed.

So Ordered.