# United States Court of Appeals
## For the First Circuit

No. 09-1161

UNITED STATES OF AMERICA,

Appellee,

v.

JUDE CELESTIN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before

Torruella, Lipez, and Howard,
Circuit Judges.

Sejal H. Patel, with whom Shannon Frison and Frison Law Firm, P.C., were on brief for appellant.
Robert A. Parker, Criminal Division, Appellate Section, U.S. Department of Justice, with whom Lanny A. Breuer, Assistant Attorney General, Gary G. Grindler, Deputy Assistant Attorney General, Carmen M. Ortiz, United States Attorney, James P. Dowden, Scott L. Garland, Assistant United States Attorneys, were on brief for appellee.

July 14, 2010

**TORRUELLA, Circuit Judge**. Jude Celestin was convicted by a jury for bank fraud and conspiracy to commit bank fraud. See 18 U.S.C. §§ 1344 and 371. He appeals that conviction on multiple grounds. First, Celestin contends that the district court abused its discretion in trying Celestin jointly with a codefendant. He asserts that the introduction into evidence of his nontestifying codefendant's confession violated his rights under the Confrontation Clause and Bruton v. United States, 391 U.S. 123 (1968), and that he suffered irreparable prejudice as a result of his codefendant's incompetent pro se representation. Next, Celestin argues that his due process rights were violated by the government's failure to turn over exculpatory evidence prior to the trial. See Brady v. Maryland, 373 U.S. 83, 87 (1963). Finally, Celestin claims that the district court improperly instructed the jury regarding an essential element of bank fraud. We have carefully considered these claims; finding no error, we affirm.

## I. Background

A.        Facts[1]

Burdley Jean, a former employee of Fleet Bank (now Bank of America), devised a scheme to steal money from customer bank accounts using counterfeit checks. Jean targeted several banks in

---

[1]    "We review the facts of a criminal case on appeal from a conviction in the light most favorable to the verdict." United States v. Mitchell, 596 F.3d 18, 20 (1st Cir. 2010)(internal quotation marks omitted).

New England, including Fleet, Sovereign Bank, and Citizens Bank. He recruited bank insiders to provide him with customer account information (such as account numbers, balances, and customer names), which Jean used to create counterfeit checks. Jean recruited other individuals to act as "runners" who would cash or deposit these counterfeit checks. All told, conspiracy members wrote bogus checks totaling in excess of $1 million.

Celestin, an account manager at Fleet's South Shore Plaza branch, was one of the bank insiders recruited by Jean. On twenty-two days over a six-month period, Celestin used his unique operator identification number ("OPID") to improperly access fourteen customer accounts, many of which had no relationship to his branch. Shortly after Celestin accessed each account, runners would begin cashing counterfeit checks against the account.

Bank records introduced at trial showed that, on certain occasions, Celestin's OPID access of these accounts was interspersed with access of his own checking account. Celestin's time and attendance records also confirmed that he was working at the bank on the days and at the times when his OPID was used to access the defrauded accounts, with one exception: on October 6, 2004, the records showed Celestin working from 4:45 p.m. to 10:15 p.m. (the bank's late shift, which was his default schedule), but his OPID records showed him accessing accounts from 10:51 a.m. to 12:58 p.m. (roughly, the early shift, which he occasionally

worked). Celestin's OPID records showed no activity between 4:45 p.m. and 10:15 p.m. on that day. The bank's computer system listed the evening shift as Celestin's default work time, and bank employees testified that the records would only have reflected a different time if Celestin had manually changed it.

In November 2004, FBI agents visited Celestin's office and questioned him about his role in the scheme. They showed him the OPID records documenting that he had accessed the defrauded accounts. Celestin admitted that he accessed the accounts, but stated that he did so only after the accounts had been defrauded. When the agents presented him with evidence that this was not true, Celestin changed his story. He explained that, at least with respect to one particular account, a representative had given him permission to access the account. Celestin was unable to explain why he had accessed the other defrauded accounts.

B.       **Procedural History**

Celestin was indicted on one count of conspiracy to commit bank fraud, see 18 U.S.C. § 371, and five counts of bank fraud, see 18 U.S.C. §§ 1344 and 2. Celestin initially pleaded guilty, but later filed a motion to withdraw his plea, which the district court granted. After a nine-day trial, in which Celestin was tried jointly with another coconspirator, Ducarmel Edouard, the jury convicted Celestin of the conspiracy charge and two counts of bank fraud. The jury acquitted him of the three remaining counts

of bank fraud.  The district court sentenced Celestin to forty-one months of imprisonment, followed by three years of supervised release.  The district court also ordered him to pay a fine of $2,500 and $587,602 in restitution.  Celestin filed a timely appeal.

## II. **Discussion**

**A.        Severance**

Celestin first argues that the district court abused its discretion when it denied his motion to sever his trial from that of his coconspirator Edouard, who chose to represent himself. Celestin asserts that, as a result of this joint trial, his rights under the Confrontation Clause were violated and, in any event, he suffered irreparable prejudice due to Edouard's strange behavior in the course of his pro se representation.

We review a severance ruling "for any manifest abuse of discretion which deprived appellant of a fair trial and resulted in a miscarriage of justice."  United States v. Peña-Lora, 225 F.3d 17, 33 (1st Cir. 2000).  "The hurdle is intentionally high," particularly in conspiracy cases, where severance "is especially disfavored."  Id. (quotation marks and citation omitted).  As the Supreme Court has recognized, "[t]here is a preference in the federal system for joint trials of defendants who are indicted together" because "they promote efficiency and serve the interests of justice by avoiding . . . the inequity of inconsistent

verdicts."  Zafiro v. United States, 506 U.S. 534, 537 (1993) (internal quotation marks and citation omitted).  For that reason, severance is warranted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  Id. at 539.  Whether this hurdle has been met is "committed to the sound discretion of the trial court." United States v. Flores-Rivera, 56 F.3d 319, 325 (1st Cir. 1995).

### 1.    Confrontation Clause Claim

The  Confrontation  Clause  of  the  Sixth  Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him."  U.S. Const. amend. VI.  The primary purpose  of  confrontation  is  "to  secure  for  the  opponent  the opportunity of cross-examination."  Delaware v. Van Arsdall, 475 U.S. 673, 678 (1986) (internal quotation marks, citation, and emphasis omitted).  For that reason, out-of-court statements which are  "testimonial"  in  nature  may  be  admitted  against  criminal defendants only in certain limited circumstances.  See Crawford v. Washington, 541 U.S. 36, 68 (2004) ("Where testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required:  unavailability  and  a  prior  opportunity  for cross-examination.").   If  these  statements  are  nontestimonial, however, the Confrontation Clause "has no application."  Whorton v. Bockting, 549 U.S. 406, 420 (2007).

-6-

Against this backdrop, Celestin asserts that he was entitled to have his trial severed from that of his codefendant because the admission into evidence of Edouard's out-of-court confession violated Celestin's rights under the Confrontation Clause. See Bruton v. United States, 391 U.S. 123, 135 (1968) (prohibiting the admission of "powerfully incriminating extrajudicial statements of a codefendant" in a joint trial). Bruton, however, applies only to a statement that is, as to the particular defendant challenging its admission, "inculpatory on its face." United States v. Rodríquez-Durán, 507 F.3d 749, 769 (1st Cir. 2007) (quotation marks and citation omitted). A statement that "identifie[s] both the declarant and his codefendant by name as the perpetrators of the crime" falls within the Bruton prohibition, but "[s]tatements that are incriminating only when linked to other evidence in the case" do not. United States v. Vega-Molina, 407 F.3d 511, 520 (1st Cir. 2005) (citations omitted).

Edouard did not testify, and was therefore unavailable for cross-examination by Celestin's counsel. His confession was, as a result, read to the jury. It stated in full:

> I met Burdley Jean at the 3C Nightclub on Blue Hill Ave. BJ asked if I were interested in cashing counterfeit checks, to which I agreed.
>
> In 2003, I cashed four checks and remember cashing a counterfeit check in Tewksbury. I remember visiting Burdley at his address on Ashmont Street in Dorchester. Burdley accompanied me during the cashing of the counterfeit checks.

-7-

> In 2004, I again agreed to cash counterfeit checks for Burdley. Burdley proceeded to give me the checks and I went on to cash them on my own and after each bank withdrawal, I would meet Burdley, relinquish the money, and receive up to 20 percent of the funds.
>
> I accept full responsibility for counterfeit checks in viewed surveillance pictures of me.

The confession made no explicit reference to Celestin. It did not implicate Celestin directly, nor did it suggest any connection between Celestin and the conspiracy or even that others beyond Jean and Edouard were involved.

Celestin argues, nonetheless, that the confession was powerfully incriminating insofar as its admission demonstrated the existence of a conspiracy to commit bank fraud, effectively lowering the government's standard of proof. But Edouard's confession is incriminatory as to Celestin, if at all, "only when linked to other evidence" of Celestin's participation in the conspiracy and, therefore, Bruton is not implicated. Vega-Molina, 407 F.3d at 520; see Rodríguez-Durán, 507 F.3d at 769 (finding no Bruton violation in a prosecution for conspiracy where the statement at issue made no explicit reference to any of the defendants who were on trial, other than the defendant who made the statement, and defendants pointed only to prejudicial inferences the jury could have drawn from the statement, including intent to participate).

Indeed, we have previously explained that the potential corroboration of the government's case resulting from the admission of a codefendant's confession is insufficient, without more, to rise to the level of a Bruton violation. United States v. DiGregorio, 605 F.2d 1184, 1190 (1st Cir. 1979) ("The fact that a codefendant's admission tended to corroborate the government's case against [defendant] is simply not enough.") (citations omitted); accord United States v. Greenleaf, 692 F.2d 182, 189 (1st Cir. 1982). Accordingly, the admission of Edouard's confession into evidence does not present a Bruton issue.

Further, the district court instructed the jury that Edouard's out-of-court statement was to be considered as evidence only against him and not against his codefendant, Celestin. This limiting instruction was sufficient to cure any prejudicial inference the jury might have drawn as to Celestin. See Richardson v. Marsh, 481 U.S. 200, 206, 211 (1987) (holding "that the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction" when the confession omits "any reference to [the defendant's] existence").[2]

---

[2] Celestin also asserts that the admission of Edouard's confession, an out-of-court statement by a non-testifying codefendant, runs afoul of the more general prohibition against testimonial hearsay. However, the prohibition applies only to those statements admitted "against" a defendant and, "[o]rdinarily, a witness whose testimony is introduced at a joint trial is not considered to be a witness 'against' a defendant if the jury is

-9-

## 2.  **Pro Se Representation of Codefendant**

Celestin also maintains that severance was necessary to avoid the substantial prejudice he suffered due to codefendant Edouard's pro se representation.  We have previously held that "[a] codefendant's pro se representation is not, without more, grounds for severance; a defendant must additionally show that strong prejudice resulted from the representation."  United States v. DeMasi, 40 F.3d 1306, 1313 (1st Cir. 1994).  A showing of strong prejudice requires that the defendant point to "specific prejudicial incidents that occurred before the jury."  Id. (emphasis added).

Here, there is no question that Edouard's behavior was, at times, bizarre.  For example, Celestin cites to the following exchange:

> Edouard: Well, as I said before in previous pleadings, that based on my First Amendment Right to freedom of religion, it's against my religion to testify or give an oath.
>
> Court: Well, you wouldn't have to take an oath and swear to God if it's against your religion.
>
> Edouard: It's against my religion to swear to anything.
>
> . . .

instructed to consider that testimony only against a codefendant," as occurred here.  Richardson, 481 U.S. at 206; see also Vega-Molina, 407 F.3d at 522.  Here, in light of the district court's limiting instruction, we find there was no violation of Celestin's Confrontation Clause rights.

> Court: If you have a religious objection to
> the standard oath, [the Clerk] is going to
> read you what the alternative will be. You'd
> be required to affirm.
>
> Clerk: "Do you affirm and declare that the
> evidence that you shall give to the Court and
> the jury shall be the truth, the whole truth,
> and nothing but the truth[?]"
>
> Court: Would you be willing to say that before
> you testified?
>
> Edouard: No, I will not.
>
> Court: And is that because of your religious
> beliefs?
>
> Edouard: Yes, it is. And also because I don't
> want to contract with this court in any way.
>
> Court: You don't want to contract.
>
> Edouard: That would be a verbal agreement and
> I don't want to do that.

He also expressed his belief that the United States government did not exist. And he maintained that he was not, in fact, Edouard, but a "holder in due course." At one point, Edouard's stand-by counsel stated to the court, "there is [a] real question in my mind as to whether the defendant has an appreciation of how to present and assist himself in his own defense."

However, these statements, on which Celestin bases his challenge, were never heard by the jury. Rather, the district judge instructed Edouard not to raise these views to the jury, and Edouard abided by that instruction. Indeed, the experienced district judge repeatedly complimented Edouard on his

"appropriate[]" and "professional" conduct before the jury, and expressly found that "[h]e's not doing anything that would distract the jury from focusing on the defense that [Celestin's counsel is] providing to Mr. Celestin." We therefore find that Celestin has not shown that he suffered "strong prejudice" based on these statements made outside of the jury's earshot. See DeMasi, 40 F.3d at 1313 & n.7 (concluding that allegedly inflammatory and prejudicial statements of pro se defendant were not made before the jury and thus did not amount to "strong prejudice").

Accordingly, on these facts, we hold that the district court did not abuse its discretion in denying Celestin's motion to sever.

**B.     Brady**

Next, Celestin seeks reversal of his conviction on the ground that the government withheld exculpatory evidence, in violation of Brady v. Maryland, 373 U.S. 83 (1963). Specifically, he asserts that the government failed to turn over in a timely manner his time and attendance records for October 6, 2004, which reflect a discrepancy between the hours listed as his work hours for that day and the hours when his OPID accessed the defrauded accounts. He maintains that these records proved he was not present in the bank at the times his OPID was used to access the accounts, undermining the government's theory of the case. By waiting until the trial was underway to provide the records,

-12-

Celestin contends, the government impeded his ability to mount a defense. The district court rejected these arguments at trial, explaining that the government did not obtain the records until after the trial had begun and that it had no obligation to produce documents not in its possession. The court further noted that Celestin was aware of these records and could have subpoenaed them himself in the two-and-half years between his indictment and trial.

Under Brady,

the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. But Brady did not create a general constitutional right to discovery in a criminal case.

United States v. DeCologero, 530 F.3d 36, 64 (1st Cir. 2008)(internal citations and quotation marks omitted). Rather, to make out a Brady violation, the defendant must show that "(1) the evidence at issue is favorable to [the defendant] because it is exculpatory or impeaching; (2) the Government suppressed the evidence; and (3) prejudice ensued from the suppression (i.e., the suppressed evidence was material to guilt or punishment)." Conley v. United States, 415 F.3d 183, 188 (1st Cir. 2005) (citing Strickler v. Greene, 527 U.S. 263, 281-82 (1999)). "Methods of enforcing disclosure requirements in criminal trials are generally left to the discretion of the trial court, and we review Brady

-13-

determinations for abuse of discretion." DeCologero, 530 F.3d at 54-55 (internal quotation marks, citation, and alteration omitted).

In this case, there was no abuse of discretion. "The government's obligations under Brady only extend to information in its possession, custody, or control," United States v. Hall, 434 F.3d 42, 55 (1st Cir. 2006), and "Brady . . . [does not] require[] a prosecutor to seek out and disclose exculpatory or impeaching material not in the government's possession." Bender, 304 F.3d at 164. There is no dispute that the government did not possess the records in question until the trial was underway, at which point it promptly turned them over to Celestin. The government explained that it did not obtain the records earlier because Celestin had admitted that he accessed the accounts in question. Moreover, as the district court noted, Celestin was well aware of his own time and attendance records, and could have subpoenaed them himself in the two-and-a-half years between his indictment and trial. Indeed, the government only obtained the records after Celestin made a specific request for them. See, e.g., United States v. Todd, 424 F.3d 525, 534 (7th Cir. 2005) (finding no Brady violation where, in part, defendant was aware of potentially exculpatory records and failed to subpoena them).

In any event, even assuming for argument's sake that Brady applied, Celestin has failed to demonstrate that the alleged failure to disclose the records was material, meaning that there is

"a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Brown, 510 F.3d 57, 71 (1st Cir. 2007) (citations omitted). Celestin raised the October 6, 2004 discrepancy between the OPID records and his time and attendance sheets repeatedly in his cross-examination of government witnesses and in his closing argument. Although Celestin contends that he was "handicapp[ed] . . . from fully using the exculpatory evidence" or from "fully impeaching the government's main witness[,]" he fails to explain how his trial strategy and defense would have been different if he had obtained the records earlier.[3]

---

[3] Celestin claims that the purported non-disclosure of his time and attendance records prevented him from calling a witness (Jude Joujoute, a former bank manager) to rebut the government's explanation for the October 6th discrepancy. The district court rejected this contention, finding that Celestin "could have tracked down [Joujoute] in the course of [the nine-day] trial," which occurred over "several weeks." Indeed, Celestin himself informed the district court that the reason he did not call Joujoute as a witness was because Joujoute "had moved to Nevada[,]" and that "[i]t was only after the verdict that counsel was able to obtain [Joujoute's] Nevada telephone number."

Further, Celestin submitted an affidavit from Joujoute in connection with his motion for a new trial, and nothing in the affidavit "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." United States v. Josleyn, 206 F.3d 144,156 (1st Cir. 2000) (quoting Kyles v. Whitley, 514 U.S. 419, 435 (1995)). Joujoute's affidavit merely provides that employees could submit a schedule change request "either in writing or orally to the branch manager or assistant manager[,]" and that he checked timesheets against "the posted weekly schedule for accuracy." Joujoute's affidavit does not establish that Celestin was not working on October 6 when his OPID was used to access defrauded accounts, nor does it dispute any of the other evidence of his guilt. Celestin himself has admitted that Joujoute "ha[d] no present memory" regarding Celestin's hours

Moreover, the evidence that Celestin himself accessed the accounts was substantial. The government introduced Celestin's November 2004 admission that he had accessed the defrauded accounts. Time and attendance records for the other twenty-one days established that Celestin was working at the bank at all other times when his OPID was used to access the defrauded accounts. Records also showed that, on October 6, 2004, Celestin did not log onto a computer at all during the period in which his records indicated he was working. There was, in addition, testimony from the bank's former manager which explained that the bank's computers generated timesheets according to the employees' default hours, and that the timesheets would have reflected a different time only if Celestin had manually changed them. In light of all this, Celestin has fallen far short of demonstrating that the government's failure to hand over the records prior to trial could have affected the verdict.

For all these reasons, there was no abuse of discretion in the district court's rejection of Celestin's <u>Brady</u> claims.

## C.         Improper Jury Instruction

Finally, Celestin contends that the district court, in responding to a jury question during deliberations, eliminated an essential element of one of the charges, improperly amending the indictment.

--------------------------------

for October 6.

In its instructions to the jury, the district court explained that the indictment charged Celestin with two distinct crimes -- one count of conspiracy to commit bank fraud and five substantive counts of bank fraud -- and that the jury could convict him of bank fraud if it found that (1) he committed the fraud himself, (2) he aided and abetted others in the commission of the fraud, or (3) another coconspirator committed the crime in furtherance of a conspiracy in which Celestin himself participated (the Pinkerton theory), see United States v. Vázquez-Botet, 532 F.3d 37, 62 (1st Cir. 2008) ("[U]nder the Pinkerton doctrine, a defendant can be found liable for the substantive crime of a coconspirator provided the crime was reasonably foreseeable and committed in furtherance of the conspiracy."). These three alternative theories of liability were taken directly from the indictment, and Celestin made no objection to this aspect of the district court's instructions. Later, during its deliberations, the jury inquired whether the use of the phrase "in furtherance of the conspiracy" in the bank fraud counts meant that these counts were "dependent on a guilty vote" on the conspiracy count. The court instructed the jury that if it acquitted Celestin on the conspiracy count, the number of the alternative theories of liability would be reduced to two: that Celestin committed or aided and abetted the specific incidents of bank fraud alleged in the indictment. Celestin contends that in so doing, the district court

impermissibly eliminated an essential element of the substantive bank fraud counts (i.e., that they were performed in the course of the charged conspiracy), resulting in a constructive amendment.

"A constructive amendment occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecution or court after the grand jury has last passed upon them." United States v. Dowdell, 595 F.3d 50, 58 n.4 (1st Cir. 2010) (quoting United States v. Fisher, 3 F.3d 456, 462-63 (1st Cir. 1993)). "Constructive amendments are forbidden by the Fifth Amendment, which guarantees defendants the right to be tried only on charges indicted by a grand jury." United States v. Bucci, 525 F.3d 116, 131 (1st Cir. 2008) (citations omitted). "A constructive amendment is considered prejudicial per se and grounds for reversal of a conviction." Id. (quotation omitted). We review a claim of constructive amendment de novo. Id. (citation omitted).

At the outset, we note that Celestin's contention that his conviction should be vacated because we cannot tell whether the jury convicted him of the two bank fraud counts on a Pinkerton theory or under one of the two alternate theories of liability is wide off the mark. The jury convicted Celestin of the conspiracy charge and "the law is crystalline that, when the government has advanced several alternate theories of guilt and the trial court has submitted the case to the jury on that basis, an ensuing conviction may stand as long as the evidence suffices to support

-18-

any one of the submitted theories."  United States v. Gobbi, 471 F.3d 302, 309 (1st Cir. 2006).  Celestin has not argued that the evidence was insufficient to support his conviction under any of the theories alleged in the indictment.

In any event, we find that the district court properly instructed the jury as to all the ways in which Celestin could be convicted of the substantive bank fraud charges, which were clearly set forth in the indictment.  There is thus no doubt that Celestin had notice of the various theories of liability on which he could be convicted.  See United States v. Hernández, 490 F.3d 81, 84 (1st Cir. 2007) (finding no constructive amendment where defendant had notice of the charges against him through the indictment).  It also follows that in answering the jury's question the district court did not broaden the bases on which Celestin could be convicted. Compare Stirone v. United States, 361 U.S. 212 (1960) (holding that an indictment was unconstitutionally broadened where prosecution offered evidence of two theories of liability –– interference with interstate sand shipments and interference with interstate steel shipments –– but grand jury indicted defendant only on the first theory), with United States v. Miller, 471 U.S. 130, 145 (1985) (finding that, even though the indictment alleged that defendant defrauded his insurer by consenting to the burglary in advance and by lying to his insurer about the value of his loss, the government's trial proof concerning only the latter permissibly

-19-

narrowed the indictment's charges). Rather, when the court explained to the jury that Celestin could not be convicted under a conspiracy theory if it acquitted him on the conspiracy charge, the court narrowed the permissible bases for conviction in that scenario; that is, the court eliminated a theory of liability rather than removed an element of the crime.[4] It is well-established that a court may "narrow[] the indictment's charges without adding any new offenses," Miller, 471 U.S. at 138, and that "where an indictment charges several offenses, or the commission of one offense in several ways, the withdrawal from the jury's consideration of one offense or one alleged method of committing it does not constitute a forbidden amendment of the indictment." Id. at 146 (citations omitted).

Celestin has failed to show any violation of his Fifth Amendment rights.

---

[4] Although Celestin refers to "in furtherance of the conspiracy" as an element of bank fraud, it is not. See 18 U.S.C. § 1344 ("Whoever knowingly executes, or attempts to execute, a scheme or artifice (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations or promises; shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both."); United States v. Brandon, 17 F.3d 409, 424 ("To prove bank fraud under 18 U.S.C. § 1344, the prosecution must prove beyond a reasonable doubt that the defendant (1) engaged in a scheme or artifice to defraud, or made false statements or misrepresentations to obtain money from; (2) a federally insured financial institution; and (3) did so knowingly.") (citations omitted).

## III. <u>Conclusion</u>

For the foregoing reasons, we affirm the district court's judgment.

**<u>Affirmed</u>**.