# United States Court of Appeals
## For the First Circuit

Nos. 13-1593
     13-1601

UNITED STATES OF AMERICA,

Appellee,

v.

JUNIOR H. DE LA CRUZ-FELICIANO,
SANDRI RIJO,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Aida M. Delgado-Colón, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Ripple,* Circuit Judges.

David J. Wenc, on brief, for appellant Junior H. De La
Cruz-Feliciano.
     Felicia H. Ellsworth, with whom Eric F. Fletcher, Howard M.
Shapiro, and Wilmer Cutler Pickering Hale and Dorr LLP were on
brief, for appellant Sandri Rijo.
     Héctor E. Ramírez-Carbo, Assistant United States Attorney,
with whom Rosa Emilia Rodríguez-Vélez, United States Attorney,
Nelson Pérez-Sosa, Assistant United States Attorney, Chief,

---

*Of the Seventh Circuit, sitting by designation.

Appellate Division, and John A. Mathews II, Assistant United States Attorney, were on brief, for appellee.

_____

May 13, 2015

_____

**RIPPLE, <u>Circuit Judge</u>**. Junior H. De La Cruz-Feliciano ("De La Cruz") and Sandri Rijo were charged with, and convicted of, conspiring to possess with intent to distribute five kilograms of cocaine and aiding and abetting others to do the same. They now appeal their convictions, alleging various procedural and evidentiary errors. For the reasons set forth in this opinion, we affirm the judgments of the district court.

## I

## BACKGROUND

This case involves a conspiracy to smuggle over 900 kilograms of cocaine into Santa Isabel, Puerto Rico. Eduardo Ubiera and Juan Baltazar orchestrated the operation. They recruited Francisco "Sandy" Navarro-Reyes ("Navarro") and Gary Brito-González ("Brito") to transport the cocaine, via a motorboat, from a "mother ship" at sea to Puerto Rico. The operation, however, did not run smoothly. While at sea, Navarro and Brito ran out of fuel and were unable to make it back to shore. At that point, according to government witnesses, Mr. De La Cruz was recruited to take another craft out to rendezvous with and refuel the stranded motorboat.

Mr. De La Cruz successfully delivered the fuel to the stranded motorboat. While still at sea, however, his own craft developed mechanical problems. Stranded at sea, Mr. De La Cruz and another individual aboard the vessel used a satellite phone

to call for help. According to Freddy Altagracia-Medina ("Altagracia"), a codefendant, Mr. De La Cruz had requested the satellite phone before departing in order to communicate with the stranded motorboat. The United States Coast Guard found Mr. De La Cruz's vessel adrift approximately sixty miles from shore and rescued its crew. Coast Guard agents questioned the men about their satellite phone. According to Agent Christopher David Xirau, the men claimed to have tossed the phone overboard because it had become wet.

Meanwhile, traveling in their refueled motorboat, Navarro and Brito reached the shore with the drugs on January 26, 2012, three days after the planned delivery date. Awaiting their arrival were several individuals recruited to help unload the motorboat. Mr. Rijo was among this group. According to government witnesses, he originally planned to serve only as a lookout; however, due to the motorboat's late arrival, he instead ended up helping to unload the cocaine from the motorboat into a Nissan Armada for transport to San Juan.

Following a tip from a confidential informant, law enforcement anticipated the January 26 delivery and were surveilling the area throughout the night. They observed several individuals unloading the drugs from the motorboat into a vehicle, but were unable to visually identify any of those involved in the operation. Two other vehicles were present at

- 4 -

the scene.  Officers stopped the motorboat and three vehicles as they departed the beach.  Ubiera and two other individuals were stopped in the Nissan Armada.  Officers found over 900 kilograms of cocaine and three firearms in the vehicle.  Navarro, Brito, and two other individuals were stopped in a second vehicle.  Baltazar, Mr. Rijo, and one other person were stopped in a third vehicle.  Three individuals were stopped in the motorboat.  All thirteen men were arrested immediately.  Officers arrested Mr. De La Cruz six days later.

On February 1, 2012, a grand jury returned an indictment, charging Mr. Rijo, Mr. De La Cruz, and their twelve codefendants with conspiring to possess with intent to distribute five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii), and 846, and aiding and abetting the same, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii) and 18 U.S.C. § 2.[1]  Everyone except Mr. Rijo and Mr. De La Cruz accepted plea agreements.  After a trial, the jury found both Mr. Rijo and Mr. De La Cruz guilty as to all charges.[2]  After sentencing, the defendants timely appealed.[3]

---

[1] The indictment also charged Ubiera and two other defendants with possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A).
[2] The district court's jurisdiction was premised on 18 U.S.C. § 3231.
[3] Our jurisdiction is secure under 28 U.S.C. § 1291.

## DISCUSSION

## A.   Mr. De La Cruz

On appeal, Mr. De La Cruz raises only one argument. It concerns the district court's questioning of Agent Xirau of the United States Coast Guard.  At trial, the agent testified about the rescue of Mr. De La Cruz aboard the vessel that had gone adrift.  Agent Xirau stated that he had asked Mr. De La Cruz and the other individual aboard the vessel about the satellite phone that they had used to call the Coast Guard. During the agent's testimony, on the fourth day of a six-day trial, the following exchange took place:

> THE GOVERNMENT: I will ask you to clarify, when you refer to one of the two individuals on the boat, what specifically as to each individual they said, if anything?
>
> AGENT XIRAU:   Roger that.
>
> THE GOVERNMENT: I was asking you about Junior De la Cruz, if upon you questioning him did he answer anything to you?
>
> AGENT XIRAU:   That was the only question that I remember him specifically giving me an answer.
>
> THE GOVERNMENT: What about the other individual?

AGENT XIRAU: I don't remember his name. When I say they, I could mean either one or the other, I don't remember who at time who was the one that gave answers to the several questions we asked.

THE COURT: But were questions generally answered?

AGENT XIRAU: Yes, ma'am.

THE COURT: Any of them express a disagreement with what the other was saying at the time?

AGENT XIRAU: No, ma'am.[4]

Defense counsel objected to the district court's questioning. In particular, counsel asserted that the questions conveyed that the district court was commenting on Mr. De La Cruz's silence when speaking with Coast Guard officials. The district court disagreed, stating that the witness "is not saying that [Mr. De La Cruz] did not answer, he says he does not remember who answered what."[5] Nevertheless, despite its disagreement with defense counsel's characterization of the exchange, the district court gave a cautionary instruction, stating that the jury was "not to draw any inferences from the

---

[4] R.401 at 69-70. We have added the names of the speakers for the convenience of the reader.
[5] Id. at 71.

- 7 -

questions that [the court] posed."[6]  "My only intent here," the district court explained, "was to assist in clarifying the situation.  But once again I instruct you that there is no intent and . . . no inference [should be] drawn from any type of question I have posed."[7]

Following the district court's cautionary instruction, Agent Xirau then testified that Mr. De La Cruz and the other individual aboard the vessel had offered a strange explanation for no longer possessing the satellite phone that they had used to call for help.  According to the agent, the men had told him that they threw the satellite phone overboard because it had become wet.  The agent described this explanation as "odd."[8]

Mr. De La Cruz now contends that the district court's questioning of Agent Xirau evinces judicial bias in violation of his right to due process of law.  "When addressing allegations of judicial bias, we consider whether the comments were improper and, if so, whether the complaining party can show serious prejudice."  United States v. Ayala-Vazquez, 751 F.3d 1, 24 (1st Cir. 2014) (internal quotation marks omitted).  We assess statements in light of the record as a whole, not in isolation.  Id.

---

[6] Id. at 72.
[7] Id.
[8] Id. at 74–75.

In assessing this claim of judicial bias, our starting point is the basic principle that "there is nothing inherently improper about a judge posing questions at trial." Id. Indeed, as we have previously observed, a court "has the prerogative, and at times the duty, of eliciting facts [it] deems necessary to the clear presentation of issues." United States v. Rivera-Rodríguez, 761 F.3d 105, 111 (1st Cir. 2014) (quoting United States v. Paz Uribe, 891 F.2d 396, 400 (1st Cir. 1989)); see also Fed. R. Evid. 614(b) ("The court may examine a witness regardless of who calls the witness."). Such questioning is permissible "so long as [the court] preserves an attitude of impartiality and guards against giving the jury an impression that the court believes the defendant is guilty." Rivera-Rodríguez, 761 F.3d at 111 (quoting Paz Uribe, 891 F.2d at 400–01). Notably, a question is not improper simply because it clarifies evidence to the disadvantage of the defendant. See United States v. Montas, 41 F.3d 775, 781 (1st Cir. 1994). "[T]he rule concerning judicial interrogation is designed to prevent judges from conveying prejudicial messages to the jury. It is not concerned with the damaging truth that the questions might uncover." United States v. Martin, 189 F.3d 547, 554 (7th Cir. 1999).

Even if a comment is improper, however, a defendant also must show that the judicial intervention resulted in

- 9 -

"serious prejudice."  Rivera-Rodríguez, 761 F.3d at 112.  As we recently have observed, this burden is comparable to demonstrating prejudice under plain error review.  See id.  In other words, "improper judicial intervention 'seriously prejudice[s]' a defendant's case when we find that there is a reasonable probability that, but for the error, the verdict would have been different."  Id.  The burden of establishing serious prejudice is more difficult where, as here, a court follows its comments with an appropriate cautionary instruction.  See Ayala-Vazquez, 751 F.3d at 26 (noting that "within wide margins, the potential for prejudice stemming from improper testimony or comments can be satisfactorily dispelled by appropriate curative instructions" (quoting United States v. Pagán-Ferrer, 736 F.3d 573, 582 (1st Cir. 2013))).

Here, Agent Xirau testified that he could not remember who, between Mr. De La Cruz and the other individual aboard the vessel, had answered his questions regarding the satellite phone.  The district court then asked whether either of the men "express[ed] a disagreement with what the other was saying at the time."[9]  This question, Mr. De La Cruz contends, "conveyed to the jury that the defendant" was "in tacit agreement with any answers to the question about the satellite phone," thus

_____
[9] Id. at 70.

- 10 -

"creat[ing] 'cover' for the government to attribute the satellite phone to" him.[10]

We perceive no error in the district court's remarks. The court's inquiry was neither tinged with partiality nor suggestive of the court's stance on Mr. De La Cruz's guilt. Rather, this inquiry merely clarified an ambiguity in Agent Xirau's testimony. That the resulting clarification was adverse to Mr. De La Cruz's case is not, without more, indicative of judicial bias. See Martin, 189 F.3d at 554. In any event, the court's remarks, which came on the fourth day of a six-day trial and were followed by an appropriate cautionary instruction, did not seriously prejudice Mr. De La Cruz's case. See Ayala-Vazquez, 751 F.3d at 25-26.

**B. Mr. Rijo**

Mr. Rijo raises three arguments on appeal. First, he contends that the Government violated its duty under Brady v. Maryland, 373 U.S. 83 (1963), by failing to disclose errors in an investigative report prior to his counsel's opening statement. Second, he submits that the district court erred in admitting evidence of his prior bad acts. Finally, he contends that the Government's closing argument inaccurately described

---

[10] Appellant's Br. 28.

- 11 -

his role in the offense, thus resulting in prejudice that warrants a new trial.[11]  We address these issues in turn.

**1.**

Mr. Rijo first submits that the Government committed a Brady violation by failing to disclose errors in a DEA Report of Investigation--known as a "DEA 6"--prior to defense counsel's opening statement.  The DEA 6 at issue was prepared by Agent William Rosario and summarized statements made by Altagracia. The DEA 6 contained several erroneous statements due to the agent's confusion of Sandri Rijo, the defendant, with Sandy Navarro.  In particular, the report erroneously stated that Mr. Rijo, rather than Navarro, was on the motorboat with Brito and had helped to transport the drugs from the "mother ship" to shore.  Agent Rosario also created handwritten notes before preparing the DEA 6.  Those notes, however, were partially in Spanish and contained at least one instance where the agent again confused Mr. Rijo with Navarro.

The Government turned over the DEA 6 and the agent's handwritten notes to defense counsel during pretrial discovery. The Government also disclosed its plans to call Altagracia as a

---

[11] Originally, Mr. Rijo also appealed his sentence on procedural and substantive grounds.  Following oral argument, however, Mr. Rijo, through his attorney, filed a signed letter asking to withdraw his sentencing challenge.  We grant Mr. Rijo's request and thus do not consider this issue further.

witness to testify that Mr. Rijo was on the shore during the delivery and helped to unload the drugs.

Before opening statements, defense counsel informed the district court and the Government of his intent to attack Altagracia's credibility, in part by claiming that Altagracia had offered three different accounts of the relevant events. One of those accounts was premised on the erroneous statements in Agent Rosario's DEA 6. Defense counsel never explicitly told the Government of his intent to rely on those statements.

During opening statements, Mr. Rijo's counsel presented a defense premised in large part on impeaching the Government's three main witnesses, one of whom was Altagracia. Defense counsel presented his attack on Altagracia's credibility as follows:

> [Altagracia] has given the government at least three different versions as to what happened. The first time he gave a version to the government when he was originally caught, he said that he had been fishing since January 23. Now, that same witness did not mention anyone else at that time, he said I was fishing since January 23, three days before they were caught. Then, in April when he is already negotiating with the government and trying to get them to give him a good deal, he says that on January 22, I took Sandri Rijo to Fajardo, my client, to Fajardo to get on a boat to meet the mother boat, or the boat bringing in the drugs closer to Puerto Rico, to go there. And he also says that he did not see Sandri Rijo again until dawn on January 26

when he came in piloting the boat that brought the drugs in.

Now, the third version that he gave, you just heard from the prosecutor. Notably when he gave the version of April he did not place Sandri Rijo anywhere else between the 22 to the 26, because Sandri Rijo was out on the boat, the mother boat. What do we say here, as I said you already heard the government give us a preview as to that.[12]

After opening statements, the Government informed defense counsel about the mistakes in its DEA 6. Defense counsel in turn moved for a mistrial, claiming that his "client['s] right to a fair trial ha[d] been compromised."[13] In particular, defense counsel expressed concern that the Government's late disclosure undermined the defense strategy that he had presented to the jury during opening statements.

The district court denied Mr. Rijo's motion. It concluded that defense counsel's ability to present Mr. Rijo's defense before the jury had not been impaired because he still could attack Altagracia's credibility at trial and could call Agent Rosario to testify about the DEA 6. Further, the court held that Agent Rosario's handwritten notes made clear that "the person identified was Sandy N[a]varro," and that the "inaccuracy in the DEA 6 . . . could be gathered by reviewing the [agent's]

---

[12] R.385 at 12–13.
[13] R.394 at 5.

- 14 -

rough notes."[14]  Defense counsel did not call Agent Rosario as a witness at trial.

Mr. Rijo now contends that the Government violated its duty under Brady by failing to disclose, in a timely manner, the errors in its DEA 6.  Specifically, Mr. Rijo submits that those errors are exculpatory because they provide evidence of a sloppy police investigation.  Although Mr. Rijo's motion for a mistrial did not explicitly allege a Brady violation, both parties assume on appeal that the motion was based on Brady.  Indeed, the Government has not argued that the claim was forfeited or waived.  For this reason, we assume that a Brady claim was properly raised before the district court, see United States v. Gonyer, 761 F.3d 157, 166 n.4 (1st Cir. 2014), and we review the district court's determination for abuse of discretion, see United States v. Celestin, 612 F.3d 14, 22 (1st Cir. 2010).

Brady requires that the Government disclose "evidence favorable to an accused" that is "material either to guilt or to punishment."  373 U.S. at 87.  In order to prevail on a Brady claim, a defendant must show that: (1) evidence was suppressed; (2) the evidence was favorable to the accused; and (3) the evidence was material to either guilt or punishment.  See Strickler v. Greene, 527 U.S. 263, 281–82 (1999).  With regard

---

[14] Id. at 12, 16.

to the first prong, we do not consider favorable evidence suppressed "if the defendant either knew, or should have known[,] of the essential facts permitting him to take advantage of any exculpatory evidence." Ellsworth v. Warden, 333 F.3d 1, 6 (1st Cir. 2003) (quoting United States v. LeRoy, 687 F.2d 610, 618 (2d Cir. 1982)). As for the second and third prongs, "[e]vidence is 'favorable to the accused' if it is either exculpatory or impeaching in nature and 'material' if there is a reasonable probability that, had it been disclosed, the result of the proceeding would have been different." United States v. Prochilo, 629 F.3d 264, 268 (1st Cir. 2011).

Brady also applies in cases where the Government delays disclosure of relevant evidence. In such cases, the defendant further must show "that the delay prevented defense counsel from using the disclosed material effectively in preparing and presenting the defendant's case." United States v. Van Anh, 523 F.3d 43, 51 (1st Cir. 2008). To carry this burden, "[t]he defendant must at a minimum make a 'prima facie' showing of a plausible strategic option which the delay foreclosed." Id.

The parties' dispute largely centers on the timing of the Government's disclosure. Ruling for the Government, the district court determined that Agent Rosario's handwritten notes, disclosed along with the DEA 6, adequately informed

Mr. Rijo of the errors in the DEA 6.  Further, the court held that, even if the Government's disclosure was late, Mr. Rijo was not prejudiced by the delay because he still could call Agent Rosario as a witness to testify about the errors at trial.  We are troubled by the district court's first rationale, but do agree that the second has merit.

As we noted earlier, evidence is not suppressed within the meaning of Brady "if the defendant either knew, or should have known[,] of the essential facts permitting him to take advantage of" the evidence.  Ellsworth, 333 F.3d at 6 (emphasis added) (quoting LeRoy, 687 F.2d at 618).  "The 'should have known' standard refers to trial preparation," and will generally impute to the defendant knowledge which he otherwise would have possessed from a diligent review of the evidence in his control. See id. at 7; see also United States v. Pandozzi, 878 F.2d 1526, 1529 (1st Cir. 1989) ("Brady does not require the government to turn over information which, with any reasonable diligence, the defendant can obtain himself." (alterations omitted) (quoting Jarrell v. Balkcom, 735 F.2d 1242, 1258 (11th Cir. 1984))). Here, the district court faulted Mr. Rijo for failing to notice incongruities between Agent Rosario's rough notes and the DEA 6, which, according to the district court, would have (or at least should have) alerted him to the errors in the DEA 6.  Although we agree that a defendant ordinarily should notice errors in an

investigative report when such incongruities are clearly present,[15] we have significant reservations, in this instance, about the district court's conclusion. Agent Rosario's notes are of poor quality. The agent's rough handwriting, combined with the fact that the notes were disclosed in the form of a darkened photocopy, rendered the material that Mr. Rijo received almost entirely illegible. Moreover, the agent's notes were partially in Spanish and contained at least one instance in which the agent further confused Mr. Rijo with Navarro.

We agree with the district court, however, that the Government's late disclosure of this evidence did not prevent defense counsel from effectively using it at trial. The Government disclosed these errors after opening statements on the first day of trial, Monday, September 10, 2012. The Government rested its case at the end of the day on Friday, September 14. The defense rested on Tuesday, September 18, without calling a single witness. Neither party called Agent Rosario to testify even though the district court, in denying Mr. Rijo's motion for a mistrial, explicitly had advised Mr. Rijo that he could do so. Defense counsel thus had seven

---

[15] Cf. Ellsworth v. Warden, 333 F.3d 1, 7 (1st Cir. 2003) (noting that a defendant's Brady claim could be barred if he "knew of [potentially exculpatory evidence] at the time of his trial and failed to pursue the lead").

days--three of which were unencumbered by trial--to use this evidence in preparing and presenting Mr. Rijo's case.

Mr. Rijo has offered no reason why this interval was not enough time for defense counsel to make effective use of the disclosed material, nor could he. See United States v. Peters, 732 F.2d 1004, 1009 (1st Cir. 1984) (holding that the Government's belated disclosure of impeachment evidence, which was "short, uncomplicated, and fairly predictable," did not violate Brady where the defendants had "two full days, including one nontrial day, in which to prepare to cross-examine" the witness). To the extent that this evidence was exculpatory, its relevance to Mr. Rijo's case was straightforward: it undermined the thoroughness and good faith of the Government's investigation. This defense is neither complicated nor inconsistent with the defense strategy pursued by Mr. Rijo. Seven days afforded ample time for its preparation. See id. On these facts, we cannot conclude that the Government's belated disclosure of this evidence prevented defense counsel from using it in preparing and presenting Mr. Rijo's case.

**2.**

Mr. Rijo next submits that the district court erred, under Federal Rules of Evidence 403 and 404(b), in admitting (1) testimony by Altagracia that Mr. Rijo had threatened him while in prison and (2) testimony by Agent Jesus Marrero that drug-

trafficking organizations would look for "experienced people" to handle a shipment of the size involved in this case. We review for abuse of discretion a district court's decision regarding the admissibility of evidence under Rules 403 and 404(b). United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008).

Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). However, this rule permits the admission of prior acts evidence having "special" relevance--that is, evidence relevant for a non-propensity-based purpose, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Id. 404(b)(2).[16] In assessing whether prior acts evidence is admissible for such a purpose, we apply a two-step test. United States v. Landry, 631 F.3d 597, 601–02 (1st Cir. 2011). First, we ask whether the proffered evidence truly possesses "special" relevance. Id. at 602. If it does, we then apply Rule 403, admitting the evidence so long as its probative value is not substantially outweighed by the risk of unfair prejudice. Id.

---

[16] As we have noted on previous occasions, Rule 404(b)(2)'s listing of permissible purposes is illustrative rather than exhaustive. United States v. Landry, 631 F.3d 597, 602 (1st Cir. 2011).

We start with the admission of Altagracia's testimony. At trial, Mr. Rijo's defense counsel cross-examined Altagracia about his limited relationship with Mr. Rijo. In particular, defense counsel asked when, if ever, he had spoken with Mr. Rijo. After first describing how they had spoken "in the field" during their criminal activities, Altagracia then responded that Mr. Rijo had threatened him while in prison:

> When I was at the 2B unit, Mr. Sandri Rijo yelled at me through the--in other words I was playing basketball out in the yard and he yelled at me and said that if I turned around with the authorities he was going to have my family kidnaped [sic], that he was going to also have me beat up and that he had already given orders to have my family kidnaped [sic].[17]

Defense counsel objected to this unexpected testimony, but the district court overruled his objection, noting that defense counsel "had plenty of time to stop th[e] witness."[18]

The Government contends that the district court did not err in admitting evidence of Mr. Rijo's threat, given that defense counsel was the one who elicited this testimony. We agree. As we have acknowledged previously, a defendant cannot complain about the admission of testimony directly responsive to a question posed by defense counsel. See United States v. Rivera-Rivera, 477 F.3d 17, 20 (1st Cir. 2007) ("Rivera cannot

---

[17] R.401 at 21.
[18] Id. at 22.

persuasively complain about the admission of this evidence, given that it was the defense--not the government--which elicited it in the course of its cross-examination. . . .");  United States v. Lizardo, 445 F.3d 73, 84 (1st Cir. 2006) (noting that where a defendant elicited challenged testimony on cross-examination, he could not "contest his own invited error" on appeal); United States v. Cresta, 825 F.2d 538, 552 (1st Cir. 1987) ("It is apparent from the record that defense counsel did elicit the response, although perhaps inadvertently, and cannot now complain of the alleged error.").  Here, defense counsel asked Altagracia whether he ever had spoken with Mr. Rijo.  In response, Altagracia stated that Mr. Rijo verbally had threatened him while in prison.  Because this answer was directly responsive to defense counsel's open-ended question, Mr. Rijo cannot now complain of its admission on appeal.

In any event, Altagracia's testimony would have been admissible even if elicited by the Government.  As the Government correctly notes, evidence that Mr. Rijo threatened a government witness is probative of his "consciousness of guilt." United States v. Burnett, 579 F.3d 129, 133 (1st Cir. 2009). "Such threats may imply that the defendant has something to hide or a desire to cover something up."  United States v. Rosa, 705 F.2d 1375, 1377 (1st Cir. 1983) (internal quotation marks omitted).  This use of prior acts evidence is entirely

- 22 -

permissible under Rule 404(b).  See Burnett, 579 F.3d at 133.

Thus, because Mr. Rijo's threat is probative in this regard,

Rule 404(b) does not require its exclusion.

Mr. Rijo's Rule 403 challenge is equally unavailing.

In prior cases involving the application of Rule 403 to evidence

of a defendant's threats against a government witness, we have

considered a variety of factors, including "whether the jury

heard graphic details of how the threat would be carried out,

whether the threat was made as an emotional or impulsive

reaction, and how important the evidence about the threat was to

the Government's case."[19]  Id. at 134 (citations omitted).  Here,

the district court certainly did not abuse its discretion in

admitting the evidence.  Altagracia's testimony did not involve

graphic or sensational details of the content of Mr. Rijo's

threat.  Further, as we noted earlier, this evidence is

probative of Mr. Rijo's consciousness of guilt, which, given his

defense that he was essentially in the wrong place at the wrong

time, was highly relevant to the Government's case.  For these

reasons, we cannot conclude that the probative value of

Altagracia's testimony was outweighed, much less substantially

so, by the risk of unfair prejudice.

---

[19] This list of relevant factors is by no means exhaustive.

Turning to Agent Marrero's testimony, at trial the agent offered testimony about cocaine sales in Puerto Rico and the practices of drug smugglers. In particular, he testified that a drug-trafficking organization would look for "experienced people" to handle a shipment of the size involved in this case.[20] Mr. Rijo contends that this testimony ran afoul of Rules 404(b) and 403 by implying that he had prior experience in drug trafficking. Because Mr. Rijo did not raise these objections before the district court, our review is for plain error. See United States v. Rodríguez-Adorno, 695 F.3d 32, 38 (1st Cir. 2012).

With respect to his Rule 404(b) objection, Mr. Rijo's argument fails at its first step. Rule 404(b) only applies to "[e]vidence of a crime, wrong, or other act." Fed. R. Evid. 404(b)(1). Agent Marrero's testimony did not reveal a crime, wrong, or other act committed by Mr. Rijo. Rather, he merely described the way in which drug-trafficking organizations generally operate. As such, his testimony does not fall within the ambit of Rule 404(b).

In his Rule 403 objection, Mr. Rijo contends that Agent Marrero's testimony suggests that Mr. Rijo was an experienced drug trafficker, thus giving the impression that he

---

[20] R.405 at 147.

had participated in such acts in the past and was likely to do so in the future. This argument falls wide of the mark. The agent's testimony simply stated that drug dealers who undertake sea-to-shore delivery operations realize the high risk of such an undertaking. Consequently, they employ only individuals who are committed to the success of the operation and who have the experience necessary to bring the venture to a successful conclusion. This testimony was both relevant and probative; it rebutted Mr. Rijo's claim that he was not a member of the conspiracy but rather a mere tag-along or innocent bystander. The importance of this evidence outweighed any possible unfair prejudice that may have resulted from the implication that experience in the drug trade necessarily indicates a prior criminal history. The district court did not abuse its discretion in admitting this testimony and certainly did not commit plain error.

**3.**

Finally, Mr. Rijo contends that the Government's closing argument inaccurately described his role in the offense, thus resulting in prejudice warranting a new trial. Mr. Rijo's argument is premised on the original transcript filed in this case. That transcript shows four instances in which the Government incorrectly referred to Sandy Navarro as either "Sandi Rijo" or "Sandri Rijo" during its closing argument.

These misstatements, assuming they occurred, portrayed Mr. Rijo as considerably more involved in the conspiracy than the evidence would otherwise show.

During the pendency of this appeal, the district court, acting pursuant to Federal Rule of Appellate Procedure 10(e), granted a motion by the Government to supplement the record on appeal with a revised transcript. This revised transcript, which the court reporter had certified and filed with the district court nearly nine months earlier, indicates that the Government did not in fact confuse Navarro with Mr. Rijo during its closing argument. The district court granted the Government's Rule 10(e) motion on the same day that it was filed, without giving Mr. Rijo an opportunity to respond.

Following the district court's order, Mr. Rijo filed a supplemental brief in this court asking us to reject the revised transcript. He also filed a motion for reconsideration in the district court. In both filings, Mr. Rijo raised several significant arguments attacking the reliability of the revised transcript.

Federal Rule of Appellate Procedure 10(e) governs the modification or correction of the record on appeal. In particular, Rule 10(e)(1) provides that, "[i]f any difference arises about whether the record truly discloses what occurred in the district court, the difference must be submitted to and

settled by that court and the record conformed accordingly." Fed. R. App. P. 10(e)(1). A district court's determination under Rule 10(e)(1) "is conclusive absent a showing of intentional falsification or plain unreasonableness." Pagán-Ferrer, 736 F.3d at 582 (quoting United States v. Serrano, 870 F.2d 1, 12 (1st Cir. 1989)).

Because Mr. Rijo was not afforded an opportunity to respond to the Government's Rule 10(e) motion, the district court never heard or considered any of his arguments before certifying the revised transcript as part of our record on appeal. In order to remedy this deficiency, we stayed Mr. Rijo's appeal following oral argument and, while retaining jurisdiction, remanded the case for the limited purpose of obtaining a ruling from the district court on Mr. Rijo's objection. In particular, we ordered the district court to address Mr. Rijo's then-pending motion for reconsideration.

On remand, the district court ordered its court reporter to submit a certified copy of her stenographer's notes from the Government's closing argument as well as an affidavit explaining how those notes support the revised transcript. The court reporter did so, explaining in her affidavit that her stenographer's notes showed that the Government had not confused Navarro with Mr. Rijo during its closing. Rather, as the court reporter explained, she had simply mistyped "Rijo" instead of

"Navarro" when transcribing her notes several months after the trial.

After receiving the court reporter's notes and accompanying affidavit, the district court held a hearing on Mr. Rijo's motion and, shortly thereafter, denied the motion in a written order. The court based its decision on the court reporter's filings, the parties' pleadings and exhibits, and the court's "own recollection and notes of [Mr. Rijo's] criminal trial."[21] Based on this evidence, the court concluded that it was "100 percent certain that the revised transcript [was] correct."[22]

The district court's order thoroughly and persuasively addressed each of Mr. Rijo's arguments. In light of the court's careful consideration of this issue, we cannot conclude that its decision to certify the revised transcript as part of the record on appeal was plainly unreasonable. See id. Accordingly, we accept the revised transcript as part of our record, and thus conclude that the Government did not confuse Sandy Navarro with Mr. Rijo during its closing argument.

**III**

**CONCLUSION**

The judgments of the district court are affirmed.

**AFFIRMED**

---

[21] R.635 at 9.
[22] Id. at 15.